539 So.2d 1024 (1989)
Charles Ralph CLANTON, Jr.
v.
STATE of Mississippi.
No. 58142.
Supreme Court of Mississippi.
February 9, 1989.
Rehearing Denied March 29, 1989.
*1025 Richard A. Smith, Tom P. Calhoun, III, Greenwood, for appellant.
Mike Moore, Atty. Gen. by Deirdre D. McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before HAWKINS, P.J., and SULLIVAN and ZUCCARO, JJ.
HAWKINS, Presiding Justice for the Court:
Charles Ralph Clanton has appealed his conviction in the circuit court of Leflore County of rape, in violation of Miss. Code Ann. § 97-3-65(2) (1985) and sentence to 25 years imprisonment.
The issues we address are the refusal of the circuit court to permit Clanton to offer into evidence before the jury two statements he gave to arresting officers, and alleged error in admitting testimony of David Swider that he had not given Clanton permission to take a magnum pistol, which Swider identified as his, from his home. The pistol was found in the parking lot of the Leflore County Hospital under a parked pickup, and where Clanton had been standing. The victim testified that Clanton was armed with a magnum pistol.
We find no error and affirm.

FACTS
On June 12, 1985, Faye Carpenter, 31 years old, married, and with two children, was working the 11:00 p.m.-7:00 a.m. shift as a data processor at the Leflore County Hospital in Greenwood. Her office was on the first floor of the hospital. She testified at trial that she first saw Clanton that night when he came in a door where she was working and asked if Betty Jones (Jones)[1] was there. She walked him out into the hall and pointed toward the first floor nurses' station, where he could ask about Jones. She explained that the next time she saw Clanton was between 3:15 and 3:30 a.m. She had stopped at a typewriter and was preparing to type when "the same person that came into the office before" stepped around a partition near the typewriter. She picked up a telephone receiver, presumably to call Jones, and was told to "hang it up." Carpenter then testified that when she turned around she saw the barrel of a gun being held close to her head by Clanton. At gun point he led her down the hall and up the stairs to the unoccupied fifth floor, Room 527.
According to Carpenter Clanton first forced her to undress while he asked her some questions about her and her family. He then instructed her to get on the bed with her face away from him, and raped her vaginally and rectally, and forced her to have oral sex. For a few minutes the two discussed what Clanton was going to do with her. He then forced her to have sex again. She explained that although he let her go to the bathroom, he told her to keep the door open, depriving her of any opportunity to lock herself in or to call the nurses' station.
On cross-examination she was asked if the pistol Clanton had was a .357 magnum, and she replied it was. She testified Clanton also put the barrel of the pistol into her vagina and cocked the pistol. He also removed his socks and put his foot into her vagina. When the sexual activity was finished, Clanton told her he did not know whether to kill her or not.
After both dressed, Carpenter testified she was led down the same stairwell, although this time not at gunpoint. They exited the stairwell near the second floor nurses' station. There she stopped and asked a question and Clanton kept walking. She did not see Clanton again.
From there she went back down to her data processing office. The time was "after *1026 six o'clock." Linda Greer was there.[2] Both she and Greer testified that upon arriving, she immediately locked both doors to the office. Greer asked her what was the matter, and remarked, "You look like someone is after you." Greer described Carpenter as being "real upset and crying," and that "her clothes were mussed and her hair was messed up." Carpenter then confided to Greer that she had been raped. Greer convinced her that she had to tell someone and be examined. They called Harry Hutchinson, the office manager, and reported the incident. The two then proceeded toward the emergency room.
On the way to the emergency room they stopped at the admitting desk and talked to Beverly Tatum about the incident. Mrs. Tatum testified she had first seen Clanton at 2:00 a.m. that morning looking for Betty Jones. At that time she had called Jones, who said that she had already talked with Clanton. Tatum called security, and requested that they escort him out. Later that morning, at 6:15, she saw him again. This time she led him to the security desk and security guard Harvey Chriswell assisted him out. She returned to her desk where she met Greer and Carpenter. She described Carpenter as "shaking, hardly coherent." She called Betty Jones who identified Clanton. She then called Chriswell.
Chriswell testified that he first escorted Clanton out of the hospital shortly after 6:00 a.m. at the request of Mrs. Tatum. Within five minutes after he returned to his office, Mrs. Tatum called and asked him to come to the business office immediately. There Mrs. Tatum and Carpenter briefly told him what had happened. Chriswell testified that after Mrs. Tatum had told him that she requested Clanton to leave twice that night, that he was a "likely person" [to have committed the crime]. He called his sergeant, David Collum, and asked him to call the police, while he searched for Clanton. He located Clanton easily. He was out in the "east employee parking lot ... standing by ... a green Ford pickup."[3] Clanton did not attempt to run, and the two "carried on a conversation, just like nothing had happened," until Officer Joe Rowe of the Greenwood police department arrived.
Officer Rowe testified he arrived at the hospital at 6:42 a.m. When he arrived he found Clanton talking with the security guard in the parking lot. The guard told him an assault and rape had been reported. Officer Rowe then asked Clanton if he "would accompany him back to the security office, there at the hospital, until I found out some more information on what had happened." Clanton waited in the security office while Officer Rowe interviewed Carpenter. Rowe interviewed Carpenter for about five minutes, and described her condition as "very upset, crying, shaking." He called Capt. Henry Burden, an investigator with the Greenwood police department.
Burden testified he received a call to come to the hospital at 6:45 a.m. on June 12, 1985. When he arrived, Carpenter was in the emergency room. She described her assailant to him. Burden's testimony was that the description matched "perfectly." He returned to the security office and read Clanton his Miranda rights, placed him under arrest, and told Rowe to escort him to the police station.
Meanwhile, Patricia Mullens and Dr. Kenneth Hines performed a rape kit on the victim. Mullens testified Carpenter was "distraught, upset, crying." Dr. Hines corroborated this testimony and stated that both vaginal and rectal smears contained spermatoza. There was also trauma to the rectum.
Capt. Burden and Carpenter both testified that later that morning, around 11:00 a.m., Carpenter came to the police station. *1027 While at the station, Carpenter was presented a series of photographs. She was able to identify the photograph of Clanton as that of the assailant. Burden obtained an affidavit and arrest warrant for Clanton at that time charging him with aggravated assault and rape.
At 2:00 p.m. on the day of his arrest, Clanton made the first of two statements. He admitted going to the hospital on the date of the alleged incident and having a gun with him. He said, however, that Carpenter consented to their sexual intercourse and that he left the gun outside.
In the second statement made seven days later, June 19, Clanton admitted taking the gun inside, but said that he did not use it to threaten her to have sex with him. Clanton made a motion to suppress prior to trial, which was heard on November 26, and overruled. The State did not introduce either of the statements into evidence at trial, however.
Joe Andrews, Jr., a hair identification expert, testified that he had examined the bed spread and the sheet taken from the bed on which the victim was raped. He found hairs which matched the victim as well as "pubic hairs which matched the known pubic hairs" of Clanton.
Clanton did not testify.
The jury returned a verdict of guilty, and Clanton has appealed his sentence of 25 years.

LAW

I. DID THE COURT ERR IN PERMITTING DAVID SWIDER TO TESTIFY HE HAD NOT GIVEN CLANTON PERMISSION TO TAKE THE PISTOL USED IN THE CRIME FROM HIS HOME?
David Swider testified at trial that Clanton and his wife were first cousins, and that the previous summer Clanton had done some interior painting in their home, and had free access to all their house when both Swider and Mrs. Swider were gone. The .357 caliber magnum pistol and holster found beneath the pickup where Clanton had been standing the morning of the offense had been introduced into evidence. Swider testified that the weapon was his, and that he kept it in a closet in his bedroom. He also testified that he had not given Clanton permission to take the pistol, without objection from Clanton, and that he had given no one else permission to take it. He had not missed the weapon until Clanton was arrested.
The State then asked Swider again if he had given Clanton permission to take the pistol, and he again testified that he had not. Defense counsel then approached the bench, and moved for a mistrial, which the court overruled, noting:
Well, I'm not paying attention to that, but I'm thinking that it is connected with this case. This shows where he got the gun that was in his possession, that the woman said he threatened her with. I think it is connected with it. You have your objection on the record.
Clanton claims no error in the introduction of the pistol and holster into evidence, and the circumstances under which it had been used by him, and later found under the pickup. His sole claim of error is the statement by Swider that he had not given Clanton, or anyone else, permission to take it from his home.
Clanton made no objection when the State first asked Swider had he given permission. Nor, was objection made to the second question and answer. It was only after Swider had answered that defense counsel moved for a mistrial. By his failure to object when the question was first asked, Clanton has waived any assignment of error on this point. Watts v. State, 492 So.2d 1281 (Miss. 1986); Gates v. State, 484 So.2d 1002 (Miss. 1986); Pennington v. State, 437 So.2d 37 (Miss. 1983).
Moreover, the fact that Swider had not given anyone permission to take the pistol had some relevancy to Clanton's going into a hospital in the early morning hours armed with a pistol that did not belong to him, and with no permission to possess from the owner. It bears on Clanton's motive. Rule 404(b), Mississippi Rules of Evidence.
At the time of the offense Clanton was twenty years of age, and had been employed as a security guard in Greenwood.

*1028 II. REFUSAL TO PERMIT CLANTON TO OFFER INTO EVIDENCE STATEMENTS HE HAD GIVEN OFFICERS
As noted, in his statements Clanton did not deny having sexual intercourse with Carpenter, including the acts she alleged, but he claimed it was with her permission. He said that it was she who had stuck the pistol barrel into her vagina.
During pretrial Clanton vigorously opposed the statements being offered into evidence by the State, which the court overruled. The State, however, at trial made no effort to offer either into evidence. Clanton did not testify in his own behalf, and no witnesses were offered by the defense. Clanton did seek to introduce the two statements.
These statements were hearsay. Ordinarily, under prerules decisions, they would have been inadmissible even if Clanton had testified, as an attempt to bolster his testimony. Wilson v. State, 451 So.2d 718, 721 (Miss. 1984); Woods v. State, 181 Miss. 321, 179 So. 559 (1938). This has been carried over into the Mississippi Rules of Evidence. Rule 613 recognizes that prior inconsistent statements may be used for impeachment purposes, but prior consistent statements cannot be used to bolster a witness. For an excellent and detailed analysis of the rationale behind the inadmissibility of prior consistent statements under the Federal Rules of Evidence (and the model for our MRE), see United States v. Quinto, 582 F.2d 224, 47 A.L.R.Fed. 621 (2nd Cir.1978). Clearly, hearsay statements such as these are inadmissible when there has been no testimony of any kind offered to support them. 582 F.2d 232. And, when a witness testifies, prior consistent statements are likewise inadmissible, except in rare and special circumstances, none of which are present here. 582 F.2d 232-234. The MRE follow our common law decisions as to such statements. Also, People v. Abeyta, 728 P.2d 327, 331 (Colo. App. 1986); United States v. Quinto, supra, 582 F.2d at 232, 47 A.L.R.Fed. 621; United States v. Check, 582 F.2d 668, 677 (2nd Cir.1978); 4 Wigmore Evidence, § 1132 at 294.
Clanton argues, however, that these statements somehow come within a Rule 803(6), (8), or (24)(C) exception. The mere fact that the statements were in writing and would have been admissible had the State offered them, assuming as the circuit judge held, they had been freely and voluntarily given, does not mean that Clanton had the right to introduce them to bolster his defense. And, most especially is this true since Clanton did not testify himself, and there is no testimony in the record before the jury that Carpenter consented to this sexual activity.
Clanton finally argues that the statements should have been admitted under Rule 803(24)(C) authorizing the admission of a hearsay statement not otherwise specifically covered in the 803 exceptions when "(C) the general purpose of these rules and the interests of justice will best be served by admission of the statement into evidence." Somehow Clanton overlooks 803(24)(B) which requires that "the statement is more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable efforts." He also overlooks the requirement that there be "guarantees of trustworthiness." These written statements hardly qualify under Rule 803(24).
We see no need to address Clanton's additional assignments of error that there was insufficiency of evidence to convict, and that the court erred in introducing into evidence clothing he had on following his arrest. The assignments are clearly without merit.
Finding no error, we affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and ZUCCARO, JJ., concur.
PITTMAN, J., not participating.
NOTES
[1] Betty Jones is a relative of Clanton's. She testified that about 1:00 a.m. on the night of the incident Clanton came by where she was working in the IC unit of the hospital and talked to her.
[2] Ms. Greer usually worked the 7:00 a.m. shift, but sometimes came in early when she had things to do in the afternoon. This was one of those days and she showed up just after 6:00 a.m. (R-II. 241)
[3] The green Ford pickup belonged to Billy Acy. Ezell Williams, a hospital grounds maintenance man, testified at trial that on the day of the incident he found a .357 Magnum pistol and holster underneath Acy's truck. (R-II. 341)