Loretta Lesley, along with Basil Hood, was arrested and charged with conspiracy to commit murder. Hood pled guilty. After trial on Loretta Lesley's charge, the jury returned a guilty verdict. Loretta Lesley has appealed to this Court alleging that: (1) the trial court erred by allowing the State to elicit testimony from a State's witness, Dale Lesley, regarding Loretta Lesley's alleged extramarital affairs in violation of Miss.R.Evid. 404(b); and (2) the trial court erred by overruling her motion to suppress statements by her to law officers and erred by admitting such evidence at trial. Because the State's proof of Lesley's alleged extramarital affairs was prejudicial and was too remote to be admitted as a show of motive pursuant to Miss. R.Evid. 404(b), We reverse and remand for a new trial consistent with this opinion.
 I.
Seventeen-year-old Loretta Lesley married twenty-five-year-old Dale Lesley on June 29, 1975. They lived in the Peppertown community of Itawamba County. In 1979, a daughter was born to the Lesleys; a son was born to the Lesleys in 1982. Dale Lesley was employed with two different trucking companies during the course of their marriage. Loretta Lesley was employed as the manager of the Itawamba Community College bookstores located in Fulton and Tupelo. She also did janitorial work at Friendship Methodist Church in Peppertown, where she and her family were also members.
Loretta Lesley testified that she was good at accumulating money. From childhood she had a personal savings account started by her parents and supplemented by her savings as an adult. She testified that she had a habit of saving small bills until she had at least $100 which she would then convert into a one-hundred-dollar-bill. She would put those bills away in her closet and use them to purchase items the family needed. She also kept some cash in a safety deposit box. By September, 1988, she had accumulated about $9,000.
David C. Beane, Loretta Lesley's father, was elected supervisor of the third district of Itawamba County in 1987. He won the seat after an election contest. A member of the Democratic Executive Committee who had been active on Beane's behalf was Basil "Buddy" E. Hood.
After Beane took over the supervisor seat, he hired Hood for several jobs. David Wayne Beane, brother of Loretta Lesley and son of David C. Beane, hired Hood to work for his logging business on *Page 1086 
several occasions. Hood also worked for a local construction company at one time. Hood had financial problems due to his irregular employment.
Hood and Loretta Lesley became casual acquaintances.
In the spring of 1988, Dale and Loretta Lesley discussed divorce due to marital differences. The marriage improved in the summer of 1988, and they ceased divorce discussions.
In the summer of 1988, Hood was having marital problems. Hood and Loretta Lesley often ran into each other at the general store operated by her mother. By mid-August, 1988, they talked with each other about their marital problems. They also discussed their financial situations. Hood explained his financial problems, and Loretta Lesley explained her habit of collecting cash. Hood separated from his wife by the beginning of September, 1988.
During the Labor Day Weekend of September, 1988, Hood experienced a confrontation with his estranged wife and her relatives. According to Loretta Lesley, Hood told her about the confrontation on Monday. Hood also asked to borrow some money. She testified that about a week later, she went to Hood's home and studied his bills, such as his house payments, other loan payments, and three or four credit card bills that were charged to their limits ($2,500-$3,000). She retrieved $3,000 in one-hundred-dollar-bills from her closet and loaned the money to Hood. She also told him that she had more money if he needed it.
Loretta Lesley and Hood had developed a mutual attraction which led to sexual intimacy sometime between August and mid-September, 1988.
Loretta Lesley gave testimony that she loaned Hood more money in late October, 1988, because he was thinking about buying a farm tractor to repair and resell. According to Loretta Lesley, she gave Hood $1,000 for a down payment on the tractor. She testified that when she found out later that Hood had not bought the tractor because it had a damaged block, she requested the return of her money. He replied that he had put it somewhere safe and would retrieve the cash later.
Loretta Lesley also testified that during one of her "rendezvous" with Hood, he asked for a picture of her and her children and that she would not give him any photographs. She gave testimony that Hood took some pictures out of a small album she carried in her purse even though she objected. Loretta Lesley said that one picture included Dale Lesley along with herself and that Hood told her he wanted to crop the photograph. At trial, the prosecutor stipulated that a cropped portion of a photograph showing Loretta Lesley alone and matching a cropped photograph of Dale Lesley which was given to the hired killers was found in Hood's possession after his arrest.
Loretta Lesley told the court that she and Dale Lesley considered divorce again in September, 1988. She testified that she and Dale Lesley heard a sermon about marriage and divorce on the first Sunday in October. They talked after the church service and agreed to make an effort to repair their marriage. Loretta Lesley called Hood to tell him she was committed to her marriage. According to Loretta Lesley, she was never sexually intimate with Hood again. She also told the court that Hood was upset and threatened suicide when she broke off their affair. Loretta Lesley testified that she was concerned about Hood's suicide threats, still ran into Hood at her mother's store, continued to speak to Hood on the telephone, remained attracted to Hood, and even sent a number of greeting cards to Hood.
Hood testified that in October, 1988, Loretta Lesley asked him if he knew anyone who would kill her husband and that he told her he did not know of anyone. According to Hood, two weeks later, Loretta Lesley asked him about finding someone. Hood told her he had not been looking for anyone. Once more, in October, Loretta Lesley asked Hood if he had found anyone to kill her husband. Hood told her that he had not. *Page 1087 
According to Hood, a man named Danny Smith who was buying a jeep from Hood was at Hood's home "about the third week of October" when Loretta Lesley telephoned to ask Hood if he had found anyone to kill Dale Lesley. Hood told her he had not and hung up. Hood then told Smith that he had a friend who needed her husband killed. Smith told Hood that he wanted to consider the matter and would get back in touch with him.
A few days later, Hood said that Smith agreed to have Dale Lesley killed for $4,000, $2,000 "to start with" and $2,000 "when the job was finished". Hood told Loretta Lesley that Smith wanted the money and a picture of Dale Lesley. Hood said Loretta Lesley gave him $2,000.00 in one-hundred-dollar bills as well as a picture of Dale Lesley. According to Hood, Loretta Lesley gave him two photographs of Dale Lesley only, with other persons in the picture already cropped off, for the use of the hired killer. That night, Hood gave the money and pictures to Smith.
Smith became an informant. Jerry Butler, an Itawamba County Deputy Sheriff, testified that he had worked on contract murder cases before and was asked by Lee County Sheriff, Jack Shirley, about November 1, 1988, to talk to an informant. Butler and Shirley met with Smith on November 2, 1988, at the State Park Road near a lake. Smith recounted to Butler and Shirley how he had been given $2,000.00, two photographs, and an '81 Toyota Land Cruiser as compensation to kill Dale Lesley.
On November 9, 1988, Smith contacted Hood and told him that he needed $2,000.00 more and that he was leaving his "partner" in charge. The next night, November 10, Hood met with Smith's partner, whom Smith introduced as "J.B." J.B. was Jerry Butler. The three men rode around Tupelo in Hood's car planning the murder. Hood stated that Loretta Lesley wanted the killing to appear to be an accident. Hood gave J.B. an additional $1,000.00. Later that night, Hood informed Loretta Lesley that he had "talked with the guy that was going to do the job and it would be done the next morning or the next day."
On November 11, Dale Lesley was taken into protective custody. Hood was arrested at work. Loretta Lesley was arrested at work by Itawamba County Deputy Sheriff Quinnell Shumpert and Lee County Deputy Sheriff David Hill. Both were told that they were under arrest for conspiracy to commit murder, and both were read theirMiranda rights.
According to Loretta Lesley, in the car on the way to the sheriff's office, Hill told her that Hood was being brought to the sheriff's office also. Loretta Lesley testified that she asked what her arrest had to do with Hood and was told by Hill that her phones had been tapped for three or four weeks, that the officers were aware of what had been going on with Hood, that the officers wanted her to try to remember everything that had happened, and that the officers wanted her to answer any questions. According to Loretta Lesley, Hill also told her that the officers did not know anything "bad" about her and just wanted to straighten out the facts. Loretta Lesley gave testimony that Hill told her, "We will help you out. We will take care of you. You will be okay." At the sheriff's office, Loretta Lesley testified that she was told by Hill, "We believe that Buddy Hood is a con man, that he conned you into something that you didn't know was going on, and we want you to help us. We'll take care of you. You'll be okay. We'll help you get your life in order."
Loretta Lesley also gave testimony that Butler asked her to sign a piece of paper verifying that her Miranda rights had been read to her. She did so. Loretta Lesley recounted for the court how Butler told her that a tape had been made the previous night in Hood's car. Butler played the portion of the tape in which Hood explained to the "hired killers" that he had been having an affair with Loretta Lesley for about a year. Loretta Lesley told the officers that this was not correct. She admitted an affair with Hood, but she told them that it had only begun a couple of months previously. Loretta Lesley testified that Butler left and she was alone again with Hill. According to Loretta Lesley, *Page 1088 
Hill again talked to her about how the officers wanted to help her.
Loretta Lesley testified that Butler returned and told her he wanted to help her. She also testified that Butler told her he had seen her brother and told him to have her father call. She testified that she asked to call her father so that he could get her an attorney and was told that she could call "in a little while". Butler then left her alone with Hill again. Loretta Lesley gave testimony that Hill repeatedly assured her that they wanted to help her. Loretta Lesley knew that she was under arrest for conspiracy to murder her husband, that the officers were trying to make a case against Hood, and that the officers wanted her assistance in their efforts.
Butler returned. Loretta Lesley gave testimony that he informed her that Dale Lesley and the officers did not want her to serve any time and that they would make a recommendation to the District Attorney, which was usually followed.
Loretta Lesley's father, Beane, testified that he was told by his son that Loretta Lesley had been arrested. Beane told the court that he then called the sheriff's office and talked to Butler, asked Butler if Loretta Lesley needed a lawyer, was told Loretta Lesley did not need a lawyer "at this time", was told the officers wanted to talk to her a little bit more and find out what they could about Hood, and was told that Loretta Lesley could go home "in a little while" after bond.
At 1:36 p.m., the officers began a tape recording of Loretta Lesley's statement. The tape recorded statement ended at 1:57 p.m., and Butler left the office.
In her recorded statement, Loretta Lesley said that she and Hood had been discussing "getting rid" of Dale Lesley for about three or four weeks. She said it was mentioned for the first time when she told Hood that she wouldn't divorce Dale Lesley and Hood told her she "could get that taken care of" and "there's other ways". According to her recorded statement, she and Hood had several conversations after that wherein Hood became angry because she was making an effort to improve her marriage. Loretta Lesley said that Hood "asked me for the money" and told her he needed it because he had already "made contact with someone". Loretta Lesley, in the recording, said, "I understood what he meant." She also said she knew what he wanted to do when he asked her for money. She also said she didn't "know if I ever really realized that he was gonna have Dale killed" even though Hood had "mentioned it several times". Loretta Lesley told the officers that she informed Hood she didn't know what he was talking about and told him, "We don't need to talk about this on the phone." She also told Hood that she didn't "like the idea of having anyone killed."
Loretta Lesley made a move to suppress the tape-recorded statement, alleging that the statement was made involuntarily due to promises and coercion. Butler, Hill, Loretta Lesley, and Beane testified at a pre-trial hearing on the motion about the events surrounding Loretta Lesley's arrest and statement. Butler and Hill maintained that no promises, threats, or coercion were used to induce Loretta Lesley to talk to them. Butler and Hill testified that particulars of the case were not discussed until Loretta Lesley had signed the rights waiver. Hill also testified that the case was not discussed with Loretta Lesley in the patrol car on the way to the sheriff's office, although Hood's name may have been mentioned on the radio.
The court overruled Loretta Lesley's motion to suppress her tape-recorded statement. A recording of Loretta Lesley's statement to the officers was admitted into evidence and played for the jury's consideration. We note that recorded statements do not conflict with and are not inconsistent with the case of Loretta Lesley.
Besides testimony already recounted, relevant events at trial to which this appeal is addressed include Dale Lesley's testimony for the State recounting an alleged affair between Loretta Lesley and a man named Joe Bates in 1982 and recounting an alleged affair between Loretta Lesley and a man named Jerry Marlow. *Page 1089 
The jury returned a guilty verdict after deliberating for three hours nineteen minutes.
 II.
We reverse the conviction of Loretta Lesley because the state's proof of her alleged extramarital affairs was prejudicial and was too remote to be admitted as a show of motive pursuant to Miss.R.Evid. 404(b).
At trial, Dale Lesley testified that Loretta Lesley had an affair with Joe Bates eight years previously. He gave testimony that the affair was common knowledge in the community and in their marriage and that Bates had even admitted the affair in a church service. He also testified that he was suspicious of her relationship with a man from Florida, Jerry Marlow, whom she knew from several conventions she had attended. Dale Lesley gave testimony that Loretta Lesley called Marlow on several occasions and even took care of personal business for Marlow, such as haircut appointments. Loretta Lesley argues in this appeal that the testimony of her husband regarding her alleged extramarital affairs was remote and was admitted in violation of Rule 404(b) of the Mississippi Rules of Evidence.
Miss.R.Evid. 404, Character Evidence Not Admissible To Prove Conduct; Exceptions; Other Crimes, subsection (b) provides:
 (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Evidence of prior "bad acts" is admissible to show motive.Hunt v. State, 538 So.2d 422, 426 (Miss. 1989); Jenkins v.State, 507 So.2d 89, 92 (Miss. 1987). Rule 404(b) permits proof of acts that motivated the crime. See McCormick, Evidence § 190, at 562 (1984).
On several occasions, this Court has addressed particular prior bad acts which can be admitted to show motive. In Mississippi, a defendant's express intention to rob a grocery store but failure to consummate the robbery is admissible to show motive to participate in an accompanying kidnapping of a store patron. The proof of an attempt to rob was found admissible because said prior "bad act" provided the purpose for the charge at trial, the attempted kidnapping. Jenkins, 507 So.2d at 93. Where a defendant killed a man and subsequently killed the man's wife a few moments later, mention of the killing of the husband was found an admissible prior bad act to prove motive in the killing of the wife where the killing of the wife was clearly motivated by the defendant's desire to effect a successful escape from his murder of the husband. Where a prior bad act and accused act are so interrelated and interconnected in time as to constitute a single or interconnected transaction, such prior bad act is admissible. Lockett v. State, 517 So.2d 1346, 1354-1355 (Miss. 1987); see also Locket v. State, 517 So.2d 1317, 1331 (Miss. 1987). In both Jenkins and Lockett, the prior bad act and the act for which the accused was being tried were part of a single chain of events, events occurring within minutes of each other.
In Clanton v. State, 539 So.2d 1024 (Miss. 1989), this Court upheld the conviction of Clanton where evidence was admitted that Clanton had stolen a .357 caliber magnum pistol on a previous occasion about one year prior to the act for which he was being tried, a rape in which he used the .357 caliber magnum pistol.Id. at 1027. In Clanton, this Court again allowed testimony of a prior bad act that was part of a single chain of connected events.
Prior bad acts such as violence on previous occasions towards someone other than the victim can be remote and inadmissible.Edlin v. State, 533 So.2d 403, 408 (Miss. 1988).
Even though a prior bad act may pass muster and be admissible under Rule 404(b), it still must satisfy the balancing test imposed by Rule 403 which requires *Page 1090 
the probative value of the evidence of other crimes to outweigh the harmful consequences that might flow from its admission.Edlin, 533 So.2d at 408; Lockett, 517 So.2d at 1331;Jenkins, 507 So.2d at 93; 2 Weinstein's Evidence, paragraph 404, p. 404-58 (1986); McCormick, Evidence § 190, at 565 (3d ed. 1984).
Dale Lesley's testimony is inadmissible under Rule 404(b). Testimony of Loretta Lesley's extramarital affairs, or suspected extramarital affairs, was remote and improperly admitted to show a motive for the crime of which she was accused. The fact that Loretta Lesley had extramarital affairs was offered to show that she was an immoral woman. The State intended to show that Loretta Lesley was an immoral woman and that she therefore tried to have her husband killed. Any extramarital affairs by Loretta Lesley occurred years prior to her affair with Hood and the planned murder of Dale Lesley. At best, prior extramarital affairs of Loretta Lesley may have proven her propensity to have another affair such as the affair with Hood, an affair she freely admitted. Any extramarital affairs of Loretta Lesley other than the affair with Hood were not part of any chain of events leading to the planned murder of Dale Lesley. Additionally, proof of previous extramarital affairs lacked relevance into the murder conspiracy and was so prejudicial so as to fail any balancing test under Rule 403. Her alleged prior adultery did not make it more likely than not that she committed conspiracy to commit murder, and it did inflame any listener.
Finally, testimony of Dale Lesley revealed his suspicions of Loretta Lesley's prior extramarital affairs. Prior adultery was not proven, as required in order for a prior bad act to be admissible under Rule 404(b). See Edlin, 533 So.2d at 408.
Other jurisdictions have found that evidence of extramarital relationships is admissible as proof of motive. Applying its rule identical to our Rule 404, the Kansas Supreme Court held that where a marital homicide is involved, evidence of a discordant marital relationship is competent as bearing on the defendant's motive and intent. State v. Green, 232 Kan. 116,652 P.2d 697 (1982). In a case decided prior to adoption of the Federal Rules of Evidence and any similar state rules of evidence, the Pennsylvania Supreme Court found that evidence of illicit relations on the part of the defendant is admissible against the defendant accused of murdering his wife as proof of motive. Commonwealth v. Heller, 369 Pa. 457, 87 A.2d 287
(1952).
However, Green and Heller are distinguished from the case at bar and are from other jurisdictions. In Green, the evidence of a discordant marital relationship consisted of the defendant's previous threats to kill his wife, the murder victim, and prior violence against his wife. In fact, the defendant had a year-old battery conviction because he had thrown a hatchet at his wife causing her to have stitches. His conviction for the killing of his wife, who had died from injuries sustained by an axe, was upheld. Green, 652 P.2d at 701. Unlike Green, Loretta Lesley was not on trial for a crime against her spouse for which she had shown a tendency before. Loretta Lesley did not conspire to kill her husband while involved in an extramarital affair on prior occasions.
In Heller, the defendant, who used an iron pipe to bludgeon to death his wife while she slept, was engaged in an affair at the time of the crime. The Pennsylvania court found evidence of the affair admissible. Heller, 87 A.2d at 289-290. UnlikeHeller, Loretta Lesley was not engaged in the alleged extramarital affairs with Bates or Marlow at the time of the alleged crime. The current affair (the relationship with Hood) was freely admitted and introduced.
Unlike Green and Heller, the evidence of Loretta Lesley's prior adultery was introduced only to show that she had a motive for killing her husband because she was unhappy in her marriage and had a reason for wanting to "get rid" of her husband. The only effect of such testimony was to show the jury that she was a "bad woman". In Green and Heller, evidence of adultery was introduced in combination with evidence of violence or current conduct *Page 1091 
to show motive. Also, in both Green and Heller, the evidence was introduced against a defendant who had actually physically committed and completed the violent murder of a spouse.
The lower court improperly allowed the prosecution to prove motive through evidence of Loretta Lesley's prior unhappiness in her marriage. We find that evidence of previous extramarital affairs was remote and did not contribute to proof of motive in the case at bar. We reverse solely on the admission into evidence of Dale Lesley's suspicions of his wife's prior extramarital liaisons and remand for a new trial.
 III.
While Loretta Lesley contends that her recorded statement was obtained by the inducement and promises of leniency and thus involuntary, the State argues that the statement was freely given and admissible. We do not reverse the conviction on this issue, but we do instruct the lower court on how to proceed when this cause is reconsidered.
When the voluntariness of a confession is at issue, the prosecution has the burden of offering a prima facie case of admissibility which, when rebutted by the defendant, then requires that the prosecution offer all witnesses to the confession. When the accused offers testimony of inducement,See, e.g., Stokes v. State, 548 So.2d 118, 121 (Miss. 1989);Agee v. State, 185 So.2d 671, 673 (Miss. 1966), the accused is entitled to a preliminary hearing on admissibility. Agee, 185 So.2d at 673. And the prosecution bears a beyond-a-reasonable-doubt burden of proof. Stokes, 548 So.2d at 122.
According to the Stokes court, when the circuit court expressly or implicitly resolves the issue of admissibility of a confession against a defendant, this Court's scope of review is limited:
 This is essentially a fact-finding function. Neal v. State, 451 So.2d 743, 753 (Miss. 1984). So long as the court applies the correct legal standards, "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous." See, e.g., Woodward v. State, 533 So.2d 418, 427 (Miss. 1988); Hall v. State, 427 So.2d 957, 960 (Miss. 1983); Ratliff v. State, 317 So.2d 403, 405 (Miss. 1975); cf. Culbreath v. Johnson, 427 So.2d 705, 707-708 (Miss. 1983); Jones v. State, 461 So.2d 686, 697 (Miss. 1984). Where, on conflicting evidence, the court makes such findings, this Court generally must affirm.
Stokes, 548 So.2d at 122; see, e.g., Holland v. State,587 So.2d 848, 859-60 (Miss. 1991).
Thus, the trial judge's finding that Loretta Lesley's statement was voluntarily given is a finding of fact which cannot be reversed unless the court applied an incorrect legal standard and his order is clearly erroneous.
Clearly, Judge Russell complied with the legal standard for determining whether Loretta Lesley's statement was voluntarily given. The court conducted a full hearing on this question alone satisfying the Agee requirement. Agee, 185 So.2d at 673.Stokes requires that all witnesses to a confession offer testimony when voluntariness is at issue. Stokes, 548 So.2d at 121. Both of the law enforcement personnel present at the time of Loretta Lesley's statement, Butler and Hill, testified as did Loretta Lesley herself and her father. We do not find that admission of Loretta Lesley's recorded statement was reversible error; however, we do note that the trial court's finding can be, and should be, improved upon remand.
Pursuant to Stokes, where there is conflicting evidence, this Court must affirm the lower court. Id. at 122. Additionally, as Loretta Lesley argues, when the testimony by the defendant of improper conduct by the officers is unrefuted, the statements must be suppressed pursuant to Lee v. State, 236 Miss. 716,112 So.2d 254 (1959) and McNeil v. State, 308 So.2d 236 (Miss. 1975).
While the allegations of improper conduct were refuted by both Butler and Hill, who testified at the pre-trial hearing that they never made any promises to Loretta *Page 1092 
Lesley, the officers only made conclusory statements. They responded to questioning with general answers that Loretta Lesley was not induced into making a statement. We find that conclusory statements are not always appropriate and are not always helpful where a trial court must determine if a defendant's statements were voluntarily given, especially in a case such as the one subjudice where the defendant has made specific allegations. Loretta Lesley has claimed that she was interviewed in the sheriff's office by a relative with her father and brother in the outer office. She has testified as to numerous specific promises and persuasive assertions made to her by the officers. The denials of promises of leniency by the officers need to be specific to her allegations. Non-specific denials are not helpful to this Court and should not occur upon remand. Upon the new trial, the trial court shall revisit this issue and make a factual finding (if the State can offer specific denials by the officers and support its premise beyond a reasonable doubt) that Loretta Lesley was not induced into making her statement and that her statement was voluntarily given.
 IV.
Testimony by Dale Lesley regarding extramarital affairs of his wife were not admissible under the Mississippi Rules of Evidence, and we therefore reverse this cause for a new trial. We note additionally that the trial court's finding that Loretta Lesley's recorded statements were voluntary was not adequate and should be improved, if proof exists, upon remand.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P. JJ., and PRATHER, ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.