# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71162-8-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| MARTIN DAVID PIETZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: October 12, 2015 |

SPEARMAN, C.J. — Martin David Pietz was convicted of murder in the second degree for killing his wife. Pietz appeals his conviction, arguing that the trial court erred by (1) admitting evidence of prior bad acts in violation of ER 403 and ER 404(b); (2) giving a to convict instruction that did not make the legal standard manifestly clear; and (3) releasing an empanelled juror outside of open court. We find no error and affirm.

## FACTS

At 10:20 p.m. on January 28, 2006, Pietz reported his wife, Nicole Pietz, as a "missing person." Verbatim Report of Proceedings (VRP) (9/16/13) at158. He told the responding officer that she had been asleep when he got home the night before, but when he woke up that morning she was gone and she wasn't there when he got home from work. He explained that Nicole had been in

No. 71162-8-I/2

Alcoholics Anonymous (AA) for dependence on pain medication, but she had been sober for eight years and was expected to celebrate a sobriety anniversary on the day she was reported missing. Pietz also told police that some of Nicole's medication was missing and he was worried that she had relapsed.

Pietz told Nicole's mother and stepfather about the missing medication and showed them her wedding ring, explaining that the couple had taken to not wearing their rings every day. He also told them that Nicole had recently started wearing her retainer outside of the home.

Nine days later, on February 6, 2006, Nicole's body was found. During the time she was missing, friends and family filled her voice mail with over forty messages expressing concern and asking her to contact them. Nicole was found wearing a plastic dental device that had been fitted to her mouth. She had bruises on her face caused by blunt force, along with bruises on her elbows, thighs, knees, and pelvis. Her neck muscles were deeply bruised, and there was evidence of hemorrhaging on both sides of her throat and in her eyes, indicative of strangulation. The medical examiner concluded that the cause of Nicole's death was asphyxia due to manual strangulation.

The State charged Pietz with second degree murder. Over Pietz's objection, the trial court admitted evidence of his extramarital affairs, his sexual interest in other women, and an attempt to loosen his wife's sexual inhibitions by spiking her drink at a club. The trial court heard testimony from one of Pietz's former co-workers with whom he had a romantic relationship from 2001 to 2003. Two other woman testified that they met Pietz in 2003, and they had either

2

kissed or slept with him after going out drinking. One woman testified that Pietz would often complain that his wife would not go out with him to social events and criticized his drinking.

Renee Stewart exercised at the gym where Pietz worked in 2003. She testified that she, Pietz, and others who worked at the gym, would often go to a nightclub together. According to Stewart, prior to one outing to the nightclub, Pietz told her that he planned to put ecstasy in Nicole's drink. That night she saw Pietz give his wife a Red Bull. Stewart testified that after drinking it, Nicole became "more sexual" with people. VRP (9/17/13) at 149. Pietz later confirmed to Stewart that he had, in fact, put ecstasy in Nicole's Red Bull. The next time at the club, Stewart saw Pietz bring his wife a Red Bull again, and witnessed a change in Nicole that "wasn't overtly sexual but ... more the intimacy (sic) amongst friends. . . ." VRP (9/17/13) at 158-59.

There was also testimony that several weeks before Nicole's disappearance, Pietz asked a customer from the gym to go out for coffee and gave her his phone number. And a few weeks after her death, Pietz asked a co-worker if he thought it was too soon to date. Nicole's co-worker testified that on January 27, 2006, the day before she went missing, Nicole was upset and told him that she "kn[ew] that David [was] having an affair." VRP (9/16/13) at 76.

Near the end of the trial, October 7, 2013, Juror 1 called chambers and spoke with the trial judge's bailiff. The bailiff then notified counsel via email that "Juror #1 called and let the court know she is ill and can no longer come to court.

3

She has been released from jury service this morning." Clerk's Papers (CP) at 522. Once trial resumed, the judge stated on the record:

"Counsel, I think you have been informed that juror number one has been having some health issues during trial, and nevertheless continued to come in everyday (sic) I am informed this morning by my bailiff that [juror number one] called in, and couldn't even get out of bed this morning, because of a systemic health problem she has. So my judgment, we will proceed without her, but she will be excused." VRP (10/7/13) at 4.

Pietz did not object until the following day, when he argued that the juror "was excused not in open court without a <u>Bone-Club</u> analysis"[1] and moved for a mistrial. VRP (10/8/13) at 6. The trial court denied the motion.

The jury received a number of written instructions, including No. 10, which read as follows:

To convict the defendant of the crime of Murder in the Second Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about January 27, 2006 through January 28, 2006, the defendant:
(a) Was committing or attempting to commit the crime of Assault in the Second Degree;
(b) Caused the death of Nicole Pietz in the course of and in furtherance of such crime or in immediate flight from such crime; and
(c) That Nicole Pietz was not a participant in the crime;

OR

(2) That on or about January 27, 2006 through January 28, 2006, the defendant:
(a) Acted with intent to cause the death of Nicole Pietz; and
(b) That Nicole Pietz died as a result of defendant's acts;

AND

---

[1] <u>State v. Bone-Club</u>, 128 Wn.2d 254, 906 P.2d 325 (1995).

(3) That any of these acts occurred in the State of Washington.

If you find from the evidence that elements (1)(a), (b), and (c), <u>or</u> (2)(a) and (b), and element (3) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty. Elements (1)(a), (b), and (c) and (2)(a) and (b) are alternatives and only one need be proved. In order to find the defendant guilty you must unanimously agree that either (1)(a), (b), and (c) or (2)(a) and (b) has been proved. You are not required to unanimously agree which of either (1)(a), (b) and (c) or (2)(a) and (b) has been proved.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to elements (1)(a), (b) and (c) and (2)(a) and (b), and element (3), then it will be your duty to return a verdict of not guilty. CP at 312-13.

The jury was also given Instruction No. 3, which read as follows:

The defendant has entered a plea of not guilty. That plea puts in issue every element of the crime charged. The State is the plaintiff and has the burden of proving each element of the crime beyond a reasonable doubt. The defendant has no burden of proving that a reasonable doubt exists as to these elements.

A defendant is presumed innocent. This presumption continues throughout the entire trial unless during your deliberations you find it has been overcome by the evidence beyond a reasonable doubt.

A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.

CP at 305.

The jury returned a guilty verdict. The court imposed 220 months of confinement. Pietz appeals.

5

## DISCUSSION

### The "To Convict" Instruction

Pietz argues that his conviction must be reversed because the "to convict" instruction relieved the State of its burden to prove all of the elements of murder in the second degree. He also argues the instruction suggests that a jury has a duty to acquit only if it finds reasonable doubt as to all of the elements, not just one. The State argues that any lack of clarity in the to convict instruction was mitigated by the other instructions, and any error was harmless.

We review jury instructions de novo in the context of the instructions as a whole. State v. Jackman, 156 Wn.2d 736, 743, 132 P.3d 136 (2006). Jury instructions must make the relevant legal standard manifestly apparent to the average juror. State v. Borsheim, 140 Wn. App. 357, 366, 165 P.3d 417 (2007) (citing State v. Watkins, 136 Wn. App. 240, 241, 148 P.3d 1112 (2006)). The requirements of due process usually are met when the jury is informed of all the elements of an offense and instructed that unless each element is established beyond a reasonable doubt, the defendant must be acquitted. State v. Scott, 110 Wn.2d 682, 690, 757 P.2d 492 (1988). It is reversible error to instruct the jury in a manner relieving the State of its burden. State v. Bennett, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).

Pietz assigns error to that part of the to convict instruction that reads "[e]lements (1)(a), (b), and (c) and (2)(a) and (b) are alternatives and only one need be proved." CP at 305. He claims that "the instruction could be read to mean elements 1(a) – (c) and 2(a) – (b) are alternatives and only one element

6

need be proved." Brief of Appellant at 19. In other words, the jury could have read the instruction to mean that it was required to convict if the State had only proved one out of the five listed elements.

Pietz also argues that Instruction 10 could have been read to require acquittal only if the jury found reasonable doubt as to all of the sub-elements of both options. The instruction states "if, ... you have a reasonable doubt as to elements (1)(a), (b) and (c) and (2)(a) and (b), and element (3), then it will be your duty to return a verdict of not guilty." CP 312-313. He argues that the use of the conjunction "and" "tells the jury that it has a duty to return a 'not guilty' verdict only if it has a reasonable doubt as to each of the three elements of the first alternative means (1(a), (b) and (c)) and each of the two elements of the second alternative means (2(a) and (b))." Reply Br. at 4.

The State concedes that the instructions were unclear, so we consider only whether the error requires reversal. A jury instruction that misstates the law such that it relieves the State of its burden to prove every element of the crime charged affects a constitutional right and therefore is subject to the rigorous constitutional harmless error standard. State v. Thomas, 150 Wn.2d 821, 844-45, 83 P.3d 970 (2004). For a constitutional error, the State bears the burden of proving that the error is harmless beyond a reasonable doubt. State v. Lynch, 178 Wn.2d 487, 494, 309 P.3d 482 (2013).

Pietz argues that the failure to properly instruct the jury on reasonable doubt is structural error requiring reversal without resort to harmless error analysis. He cites Sullivan v. Louisiana, 508 U.S. 275, 281-82, 113 S.Ct. 2078,

7

124 L.Ed.2d 182 (1993); Miller v. State, 298 Kan. 921, 923, 318 P.3d 155 (2014); and State v. Smith, 174 Wn. App. 359, 298 P.3d 785 (2013) to support his argument. Each of these cases is easily distinguishable. In Sullivan, the jury was given a written definition of reasonable doubt that was identical to one held unconstitutional in Cage v. Louisiana, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (disapproved of on other grounds by Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). The definition "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty." Cage, 498 U.S. at 41.

The other two cases involved substitutions of words that potentially reduced the State's burden of proof or changed the obligation to acquit a defendant. In Smith, the jury was instructed that if it had a reasonable doubt it "should" return a verdict of not guilty, instead of that it had a "duty" to do so as set forth in 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.21 (3d ed. 2008) (ELEMENTS OF THE CRIME); Smith, 174 Wn. App. at 363. We observed that at one point, the jury was deadlocked and we could not discern how unanimity was finally reached. But one possible reason was that "jurors concluded from the court's instructions that while jurors with lingering doubts *should* return a verdict of not guilty, they did not have to." Id. at 369. Thus, we held the erroneous instruction was structural error which necessitated reversal, because of "the difficulty of assessing the effect of the error." Id. at 368-9 (quoting State v. Wise, 176 Wn.2d 1, 14 n.7, 288 P.3d 1113 (2012) (quoting

Gonzalez v. Lopez, 548 U.S. 140, 149 n.4, 126 S. Ct. 2557, 165 L.Ed.2d 409 (2006)).

Similarly, in Miller the court found that an instruction that described the test as "reasonable doubt as to the truth of each of the claims required to be proved by the State," instead of "reasonable doubt as to the truth of any of the claims" was structural error. Miller, 298 Kan. at 930. The Miller court found that "[a] jury instruction that a jury is reasonably likely to have applied in a way that could produce a guilty verdict despite reasonable doubt is per se prejudicial." Miller, 318 P.3d at 935.

Unlike in Smith or Miller, here there was no reasonable possibility that the jury applied the instruction in a way that compromised Pietz's right to a verdict of not guilty except upon a jury concluding that each element of the charged crime was proved beyond a reasonable doubt. Pietz contends the jury may have understood the instruction to require a guilty verdict even if it had, for example, a reasonable doubt as to all of the sub-elements except that Nicole was killed in Washington State. Or, he suggests that the jury may have understood that it was required to find him guilty even if the State proved only one element of the crime beyond a reasonable doubt, for example, that Nicole was not a participant in the crime. But when the court's instructions are viewed as a whole, neither of these readings of the instruction is even remotely feasible. Instruction No. 3, the "reasonable doubt" instruction, in particular, explained to the jury the State's "burden of proving each element of the crime beyond a reasonable doubt." CP

9

305 (emphasis added.) And Pietz has identified nothing in the record that suggests the jurors were confused about the instruction.

In addition, as the State points out, at trial the only element in contention was the identity of Nicole's killer. The evidence that someone intentionally killed Nicole by deliberately strangling her, in Washington was undisputed. Thus, even if we were to assume the jury read the instruction as Pietz suggests, the error would only have affected the verdict if the jury somehow found reasonable doubt about the undisputed elements.

Although the to-convict instruction was not a model of clarity, we fail to see how it affected the verdict in this case. It neither relieved the State of its burden to prove every element beyond a reasonable doubt nor permitted the jury to find Pietz guilty without finding the evidence sufficient on each element of the crime. Accordingly, we reject Pietz's claim of structural error. We also conclude beyond a reasonable doubt that any error in the instruction was harmless because we can discern no way in which the error contributed to the outcome of the trial. Thomas, 150 Wn.2d at 845. The evidence against Pietz, while circumstantial, was substantial and compelling.

Public Trial

Pietz argues that his constitutional right to a public trial was violated because a sitting juror was released from service by the bailiff. The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee a criminal defendant's right to a public trial. U.S. Const. amend. VI; Wash. Const. art. I, § 22; State v. Bone-Club, 128 Wn.2d 254, 261–62, 906 P.2d 325 (1995).

Whether a defendant's constitutional right to a public trial has been violated is a question of law that is reviewed de novo. State v. Wilson, 174 Wn. App. 328, 334, 298 P.3d 148 (2013). A reviewing court must first determine if "the proceeding at issue implicates the public trial right, thereby constituting a closure at all." State v. Sublett, 176 Wn.2d 71, 292 P.3d 715 (2012). The appellant must show that a closure occurred in the first place. State v. Koss, 181 Wn.2d 493, 503, 334 P.3d 1042 (2014).

Pietz cites to Watters v. State, 328 Md.38, 42, 612 A.2d 1258 (1992) and State v. Irby, 170 Wn.2d 874, 878, 246 P.3d 796 (2011), to support his argument that the bailiff excused the juror improperly via e-mail. In Watters, a deputy sheriff excluded the public and press from voir dire and jury selection. Pietz cites Watters to show that the public's trial right can be violated by a person other than a judicial officer. In Irby, the court held that an e-mail agreement among counsel and the judge to release jurors outside of the defendant's presence violated his right to a public trial.

But here, Pietz has not shown that Juror 1 was actually excused outside of open court via e-mail to the parties or by the bailiff's phone conversation. On the contrary, the record shows that the juror was excused in open court, with no objection. In response to Pietz's motion the following day, the trial court pointed out that he dismissed the juror in open court and with regard to the notion that his bailiff excused the juror, the judge noted:

> ... let me say, my bailiff has no authority to excuse a juror. She can only notify me of the condition of a juror. I'm the one who excuses the juror after I brought it up to counsel in open court.

VRP (10/8/13) at 6.[2]

Furthermore, any possible error that resulted from removing the juror was harmless. The only feasible course of action was to excuse Juror 1 and seat an alternate juror. Pietz fails to even suggest what other course of action was available to the trial court. Under these circumstances, there is not even a remote possibility that the juror's removal had any effect on the outcome of Pietz's case.

Evidentiary Rulings

Pietz also argues that the trial court erred by admitting evidence of his extramarital affairs and interest in other women shortly before and after Nicole's death. He argues that the evidence was inadmissible under ER 404(b) and its unfair prejudicial effect outweighed any probative value. The State argues that the trial court properly admitted evidence of the affairs as proof of motive.

The test for admitting evidence under ER 404(b) requires the trial court to (1) find by a preponderance of evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. State v. Thang, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). A trial court's decision to

---

[2] CrR 6.5 vests authority with the trial court to discharge a juror who is unable to perform his or her duties. Pietz implies that the judge exercised this authority through the bailiff and that her email to the parties is confirmation that the discharge did not occur in open court. He argues that the judge's statement that he excused the juror in open court was disingenuous and "a concerted effort to create a record that would make the issue appeal-proof." Reply Brief of Appellant at 9. We decline to even consider this argument because Pietz offers no facts in support of this dubious claim.

admit evidence under ER 404(b) will be reversed only for abuse of discretion. State v. Wade, 138 Wn.2d 460, 463–64, 979 P.2d 850 (1999). A court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds. Id. at 464 (citing State ex rel. Carroll v. Junker, 79 Wn.2d 12, 482 P.2d 775 (1971)). In a doubtful case, the evidence should be excluded. Smith, 106 Wn.2d at 776.

Proof of motive is a proper basis for the admission of prior acts under ER 404(b). State v. Benn, 120 Wn.2d 631, 653, 845 P.2d 289 (1993); State v. Terrovona, 105 Wn.2d 632, 650, 716 P.2d 295 (1986). Motive is defined as "the moving course, the impulse, the desire that induces criminal action on part of the accused. . . ." State v. Powell, 126 Wn.2d 244, 260, 893 P.2d 615 (1995) (quoting Black's Law Dictionary 1014 (6th rev. ed.1990)). Motive is well recognized in murder cases as evidence of intent, premeditation, or purpose. State v. Halstien, 122 Wn.2d 109, 119, 857 P.2d 270 (1993).

Under State v. Messinger, 8 Wn. App. 829, 835, 509 P.2d 382 (1973) "[e]vidence of marital disharmony and infidelity may be relevant and material and be admissible if there exists some causal relationship or natural connection between the misconduct and the criminal act with which the accused stands charged." (Citing State v. Gaines, 144 Wash. 446, 258 P. 508 (1927)). In that case the court admitted unspecified evidence of marital infidelity known to and committed by both parties, along with the fact that the parties had consulted an attorney regarding a divorce a week prior to the incident. Id. The evidence was considered relevant and material to the issue of motive; "[i]n cases where there is

13

no proof of who committed the criminal act, proof of motive is important, and often decisive." Id. (Citing State v. Barton, 198 Wash. 268, 277-79, 88 P.2d 385 (1939)). Here, the case relied wholly on circumstantial evidence as to the identity of Nicole's killer. The State argues that evidence of adultery shows "Pietz's genuine unhappiness with Nicole and with being tied to her. . . ." Br. of Respondent at 34.

Pietz cites two cases from other jurisdictions to support his argument that evidence of extramarital affairs are only relevant if they are combined with evidence of violence of current conduct that would show motive. In Camm v. State, 812 N.E.2d 1127 (Ind. 2004) the Indiana supreme court excluded evidence of extensive extramarital affairs as more prejudicial than probative. The court reasoned that

> to be admissible, evidence of a defendant's extramarital affairs should be accompanied by evidence that such activities had precipitated violence or threats between the defendant and victim in the past, or that the defendant was involved in an extramarital relationship at the time of the completed or contemplated homicide. The admissibility of such evidence may be further constrained by concerns of chronological remoteness, insufficient proof of the extrinsic act, or the general concern that the unfair prejudicial effect of certain evidence might substantially outweigh its probative value in a particular case. Id. at 1133.

In that case, there was no evidence of a violent or hostile relationship, that the defendant ever threatened his wife with harm, or that he was involved in an extramarital relationship at the time of her murder. Id. Similarly, in Lesley v. State, 606 So.2d 1084 (Miss. 1992), a Mississippi court excluded evidence of earlier affairs, because they occurred years before both her current affair and the

14

planned murder of her husband. The court found that the earlier incidents were not part of any chain of events leading to the planned murder. Id. at 1090. The defendant's alleged adultery did not make it more likely than not that she committed conspiracy to commit murder. Id. Following the reasoning in those cases, Pietz argues that the evidence of his affairs were too remote in time and had no connection to any possible motive to harm his wife.

The evidence admitted consisted of affairs dating back to 2003 and some more recent flirtations, including testimony about Pietz being interested in dating a few weeks after Nicole's body was discovered. Taking all of the evidence into consideration, the trial court found that "[t]he State ha[d] a continuing pattern that would suggest that the defendant had a long-standing dissatisfaction with their sexual relations in his marriage, and that had been going on from before the marriage, and there is an inference it went on all the way through the marriage up to the date of the death of his wife." VRP (9/9/13) at 90-91. The trial court observed that if the evidence had only consisted of old affairs, without a continuing pattern, it would have excluded it under ER 403. Id. at 91. But it found that the evidence was relevant to establishing motive because Pietz "was not happy with his wife, and sought out lots of other folks. To have it happen, he perhaps manipulated his wife to change that relationship, and it just wasn't satisfactory," and "[t]hey argued about it, apparently." Id. at 91. Because the trial court properly balanced the probative value and prejudicial effect of the evidence, its admission was not an abuse discretion.

Pietz argues that the admission of evidence that Pietz secretly spiked his wife's drink with ecstasy was irrelevant and highly prejudicial. The trial court found the evidence to be relevant because "the witnesses assert[ed] he did it against his wife's will, without her knowledge. . . . If that's true, it would suggest that ... he was willing to harm his wife in order to get what he wanted." VRP (9/11/13) at 10-11. Pietz argues that this evidence is not probative because it is "[d]oubtless there are many spouses dissatisfied with their marital sex lives and seek, through various means, to spice things up," and that such dissatisfaction cannot be equated to a motive for murder. Reply Br. at 13. But here, there was no mere effort to "spice things up." According to the testimony, Pietz was well aware of his wife's substance abuse issues and surreptitiously gave her an illegal controlled substance in order to conform her sexual behavior to his wishes. Under these circumstances, there was no abuse of discretion in admitting this evidence.

Pietz next assigns error to the trial court's admission of testimony that Nicole knew about her husband's affair because her state of mind was not relevant to a material issue at trial. Pietz argues that the trial court's reason for admitting such statements rests on speculation, because there was no expressed intention to confront Pietz that night. The trial court admitted the testimony, because it pertained to "whether she suspected it, and was angry about it. On the day in question was she angry that he had been having this long-standing extra marital relationship? And if she was, then that provides a very

fertile ground for them to have a pretty hot argument on." VRP (9/9/13) at 94. We find no error in the trial court's reasoning.[3]

Finally, Pietz argues that the trial court erred when it admitted evidence of the voicemails left on Nicole's phone. Pietz contends that any probative value of the voicemail was greatly outweighed by the prejudicial effect. The trial court found that Pietz's defense was based on the theory that Nicole was still alive at some period on Saturday, January 28, 2006, there was "certainly relevance to the fact she continue[d] to receive pleading voicemails from her friends asking her to call them." VRP (10/2/13) at 65. The court found that because the phone messages indicated "a fairly strong inference that if she was alive she certainly wasn't picking up her cell phone. And given the fact that we all know we're tied at the hip to our cell phones these days, that's unlikely." Id. Another inference was that "she was no longer alive to return those phone calls," and that "that in and of itself is sufficient to say it's admissible regardless of the fact that they were all from other people rather than your client and there being an inference your client should have been included." Id. We find that the trial court acted within its discretion when it admitted evidence of the voicemails.

---

[3] In his statement of additional grounds, Pietz assigns error to the trial court's admission of evidence of Nicole telling her co-worker that she knew Pietz was having an affair. He argues that such evidence should have been excluded because it was inadmissible character and propensity evidence. He also argues that evidence of his acts of infidelity should have been excluded under ER 403 and ER 404(b). Because Pietz has not set forth any arguments that were not raised by his counsel in the main brief, we do not address them separately.

No. 71162-8-I/18

Affirm.

WE CONCUR:

Spearman, C.J.

Cox, J.

18