751 So.2d 1060 (1999)
Anderson SKINNER, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01367 COA.
Court of Appeals of Mississippi.
June 29, 1999.
Rehearing Denied October 5, 1999.
*1062 H. Lee Bailey Jr., Winona, Attorney for Appellant.
Office of the Attorney General by W. Glenn Watts, Attorney for Appellee.
BEFORE BRIDGES, C.J., COLEMAN, AND IRVING, JJ.
COLEMAN, J., for the Court:
¶ 1. Pursuant to the jury's verdict that Anderson Skinner was guilty of the murder of Annie Lou Flowers "with deliberate design to effect [her] death" as charged in the indictment, the Circuit Court of Montgomery County entered its judgment of conviction in which that court sentenced Skinner "to serve the remainder of his natural life in the custody of the Mississippi Department of Corrections." After the trial court denied Skinner's "motion for judgment of acquittal notwithstanding the verdict and in the alternative for new trial," Skinner appealed the trial court's judgment. In his appeal, Skinner presents for this Court's analysis and resolution the following nine issues, which we quote verbatim from the statement of issues set forth in his brief as required by Rule 28(a)(3) of the Mississippi Rules of Appellate Procedure:
1. The verdict of the jury was against the overwhelming weight of the evidence.
2. The court erred in denying Skinner's motion to suppress the statement regarding the whereabouts of the gun and the gun itself.
3. The court erred in denying Skinner's objection to the introduction of photographic evidence.
4. The court erred in denying Skinner's objection to State's Instruction S-1.
5. The court erred in failing to grant Skinner a peremptory instruction.

*1063 6. The court erred in denying Skinner's objection to State's Instruction S-3.
7. The court erred in failing to grant to Skinner instruction D-7.
8. The court erred in failing to grant to Skinner instruction D-12.
9. After the trial and sentencing of Skinner on October 21, 1997, Skinner was being taken out of the courthouse when he saw Napoleon Butts, Charlie Lane and Frank Goldman. Butts was in the act of giving Lane and Goldman money, when Lane and Goldman said, "That's not what you promised. We got the job done." This occurred after the trial in the instant case and constitutes evidence of perjury and conspiracy to unlawfully convict Skinner. This occurrence comprises newly discovered evidence and false testimony against Skinner.
Skinner offers neither authority nor argument on his first, fifth, and seventh issues; thus, we decline to review them. See Smith v. Dorsey, 599 So.2d 529, 532 (Miss. 1992) (holding that because "the appellants fail to cite any authority to support the[ir] three propositions ... and decline to devote any discussion or attention whatsoever to these alleged errors[,] ... this Court is unable to assess these issues on the merits ... [so that] this Court is under no obligation to consider the assignments"). This Court's review and analysis of Skinner's remaining six issues bares no error committed by the trial court; hence its judgment and sentence are affirmed.

I. FACTS
¶ 2. Around nine o'clock on the evening of Friday, September 12, 1997, Charlie Lane, Stacey Fondrine, Frank Goldman, and Marie Lane were sitting on a bench located outside the mobile home which belonged to Sammie Lane, who was Charlie Lane's brother. Sammie Lane's mobile home was located in a mobile home park located just outside the corporate limits of the City of Winona. The mobile home which Annie Lou Flowers occupied was located next-door to Sammie Lane's mobile home. Only a few feet separated the Lane and the Flowers mobile homes. The following events represent a synthesis of the testimony of these four persons.
¶ 3. An argument erupted between Anderson Skinner and Ms. Flowers. It lasted for approximately five to ten minutes, after which Skinner emerged from Ms. Flowers's mobile home, got into his blue Pontiac automobile, and drove away. A few minutes later, Skinner returned in his car, parked it outside Ms. Flowers's mobile home, and entered it. An argument between Ms. Flowers and Skinner began anew. Charlie Lane who sat on the bench outside heard Ms. Flowers tell Skinner that "he need[ed] to leave because ... she didn't feel like no company [sic], and she was tired...." Charlie Lane heard Skinner say "that somebody was going to die or something" after he re-entered Ms. Flowers's mobile home.
¶ 4. After Charlie Lane heard Skinner tell Ms. Flowers, "Just hold on for a minute," Skinner emerged from Ms. Flowers mobile home and walked to the "right-hand side" of his Pontiac. Skinner attempted to open a door on the right side of his car, and then walked around to the driver's door, which he opened. Skinner got into the car and then "came out with a rifle." Skinner approached the front door of Ms. Flowers's mobile home with the rifle in his hand. None of the four persons seated on the bench saw what happened next, but all testified that they heard Skinner fire the rifle as many as ten times. Ms. Flowers ran from the back door of her mobile home and "hollered: `Y'all help me. This man [is] going to shot [sic] me. He is trying to kill me.'" Ms. Flowers collapsed on Sammie Lane's car, which was parked between the two mobile homes, and slumped to the ground.
¶ 5. Charlie Lane left to call 911, in response to which an ambulance arrived and carried Ms. Flowers to the hospital, although she had already died. In further *1064 response to Lane's call to 911, Montgomery County Deputy Sheriff John Paul Davis was dispatched to Ms. Flowers's mobile home by the sheriffs dispatcher "in the neighborhood of 9:51 [p.m.]." Another deputy sheriff, Chuck McIntyre, who had been on duty at a football game in Kilmichael when he was dispatched to Ms. Flowers's mobile home, arrived about ten minutes after Deputy Davis. The two deputies instructed the bystanders not to enter Ms. Flowers's home, and they began their investigation.
¶ 6. The deputies found the front door of Ms. Flowers's home to have been riddled with eight bullet holes, all of which were determined to have been caused by bullets' entering the exterior side and exiting the interior side of the door. Deputy McIntyre found the front door to be locked when he tried to enter from the outside. The interior of the mobile home inside the front door was littered with wood particles blown from the door by the emerging bullets. A ninth bullet crashed into the door knob on the front door's exterior. The two deputies found six cartridge hulls located outside the front door at distances ranging from six to nine feet from the front door.
¶ 7. At approximately 11:25 that same night, someone called the sheriff's department to report that Skinner was at his home. Deputies Davis and McIntyre responded to the call and drove their separate vehicles to Skinner's home, where they found Skinner sitting on the front steps of his home. While the State and Skinner dispute the sequence of events after the two deputies arrived, Skinner led them to the rifle which he had placed in some kudzu vines at the very edge of the back yard of his home, where the grass mowing stopped. Deputy McIntyre retrieved the .22 rifle and inspected it. He found one "live round" jammed in the bolt of the rifle. The rifle also "had five additional rounds in it." After the two deputies took Skinner to the sheriffs department in Winona, Skinner executed a waiver of his right not to incriminate himself (the Miranda rights) and provided the officers with his rendition of the events that culminated in Ms. Flowers's death. The deputies recorded Skinner's statement.
¶ 8. According to Skinner, Ms. Flowers had brandished a knife and pursued Skinner to the front door of her home. Skinner maintained that when he "went out the door, she started out with the knife." He admitted that he "got a gun" and "went back to the door." Skinner asserted that "[w]hen she started back, I finally shot her." When Skinner was asked, "How many times did you shoot?," he replied, "I don't remember. About four or five." Skinner maintained that Ms. Flowers had threatened to kill him when she was brandishing the knife. Skinner's version was that Ms. Flowers was standing in the open door when he first fired his .22 rifle and that she "slammed the door" after he began shooting.

II. REVIEW AND RESOLUTION OF THE ISSUES

A. Skinner's second issue: The court erred in denying Skinner's motion to suppress the statement regarding the whereabouts of the gun and the gun itself

1. Basis in the record
¶ 9. The trial court conducted a hearing on Skinner's motion to suppress evidence seized, which Skinner's counsel filed the same day that the trial began, after the jury had been selected but before the State called its first witness. Skinner testified that Deputy John Paul Davis was the first officer to arrive at his house, where Skinner was sitting "on the steps at [his] house." Deputy Davis summoned Skinner to the side of the patrol car, where the deputy sheriff handcuffed Skinner and told Skinner to get into the patrol car. Skinner then testified that after he got into the patrol car, Deputy Davis "mentioned the gun." Skinner told the deputy that he "couldn't show him where the gun was, but *1065 [he] could take him to it." According to Skinner, he exited the patrol car and led Deputy Davis to the .22 rifle, which he had placed on some kudzu vines located at the very edge of Skinner's back yard as marked by where Skinner stopped mowing the grass.
¶ 10. Skinner testified that the other deputy sheriff, Chuck McIntyre, did not arrive on the scene until after Skinner led Deputy Davis to the location of the rifle on the kudzu. According to Skinner, Deputy Davis directed Deputy McIntyre after McIntyre arrived to bring Deputy Davis a rubber glove to wear when Deputy Davis picked up the rifle. However, Skinner testified that it was Deputy McIntyre who actually retrieved the rifle. After the two deputies had recovered and secured the rifle in Deputy McIntyre's pickup truck, they again put Davis in the patrol car. Skinner insisted that only then did Deputy McIntyre advise him of his right not to incriminate himself in accordance with Miranda. Skinner testified that Deputy McIntyre came to the patrol car where "he read my rights."
¶ 11. The State's first witness on Skinner's motion to suppress was Deputy John Paul Davis. Deputy Davis testified that as Skinner approached his patrol car in accordance with Davis's request that Skinner do so, Deputy Chuck McIntyre, who had followed Deputy Davis in McIntyre's pickup truck to Skinner's home, "was walking up behind me." According to Deputy Davis, as he "was getting ready to put the cuffs on [Skinner]," Deputy McIntyre "was advising him of his rights because we had felt like from talking to people that ... [Skinner] was the one that [sic] had committed that crime." Deputy Davis concluded that Skinner, Deputy McIntyre, and he were "on the driver's side of my car" when Deputy McIntyre advised Skinner of his rights "[b]efore we found the rifle." Deputy Davis concluded his testimony by opining that Skinner "understood his rights" and that Skinner "voluntarily" took the two deputies "to where the rifle was located" without coercing or threatening Skinner.
¶ 12. Deputy Sheriff Chuck McIntyre was the State's second witness. Deputy McIntyre testified that he "pulled up right behind Officer Davis" when they arrived at Skinner's home. Deputy McIntyre corroborated Deputy Davis's testimony that he, Deputy McIntyre, "read [Skinner] his rights" as Deputy Davis "put the handcuffs on" Skinner. The following excerpt from the State's direct examination is relevant to Skinner's argument which he offers to support his second issue:
Q. Can you tell us, Deputy McIntyre, if you advisedat that time if you advised the defendant that he had the right to remain silent?
A. I did. I read him his whole Miranda rights.
Q. That anything he said would be used against him in a court of law.
A. That's correct.
Q. And had a right to have an attorney present before any questions were asked.
A. That's correct.
Q. That if he could not afford an attorney one would be appointed to him.
A. That's correct.
Q. That he could stop answering questions at any time he wanted to.
A. That's correct.
Q. Did you ask him if he understood his rights?
A. I did.
Q. What did he reply?
A. He did.
¶ 13. After the two deputies recovered the .22 caliber rifle, Deputy Davis drove Skinner to the Montgomery County Sheriff's Department. There Skinner signed a formal waiver of his right not to incriminate himself and gave an oral statement, which Deputy McIntyre recorded. The gist of Skinner's recorded statement was that he shot Ms. Flowers in self-defense.

*1066 2. Skinner's argument

¶ 14. There are two prongs, both factual, to Skinner's argument. The first is that, as Skinner testified, Deputy McIntyre did not Mirandize him until after Skinner led the deputies to where he had disposed of the rifle with which he had shot Ms. Flowers. The second prong is that even if Deputy McIntyre did advise Skinner of his right not to incriminate himself before Skinner led the deputies to the location of the rifle, Deputy McIntyre's advice was inadequate because, according to Deputy McIntyre's testimony under cross-examination, Deputy McIntyre failed to advise Skinner that he had a right to remain silent. Again, we quote from the record to illustrate the basis for Skinner's assertion:
Q. Well, tell me. What rights did you advise him of that night?
A. I advised him that, that anything that he said could be used against him in a court of law. I advised him that he had the right to an attorney. If he couldn't afford one, one would be appointed to him at no charge. I advised him that he had the right to, to stop answering any questions at any time until his lawyer was present.
Later, defense counsel asked Deputy McIntyre if he was certain that the foregoing answer included all the "rights" about which he had advised Skinner. McIntyre replied, "That's correct." Skinner asserts that it was not until the State's re-direct examination of Deputy McIntyre that McIntyre was asked, "Did you advise him that he had the right to remain silent?" McIntyre replied, "Yes, Sir." Skinner's assertion ignores the State's direct examination of Deputy McIntyre about whether he had advised Skinner of his right to remain silent, which we previously quoted.

3. Analysis and resolution of the issue
¶ 15. To protect individuals from self-incrimination, officers are required to give warnings explaining constitutional rights prior to interrogation when an individual is in custody. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Mississippi Supreme Court's standard of review for assessing trial court rulings at suppression hearings is the following:
"Once the trial judge has determined at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." Sills v. State, 634 So.2d 124, 126 (Miss.1994) (quoting Frost v. State, 483 So.2d 1345, 1350 (Miss.1986)). "Such findings are treated as findings of fact made by a trial judge sitting without a jury as in any other context. As long as the trial judge applied the correct legal standards, his decision will not be reversed on appeal unless it is manifestly in error, or is contrary to the overwhelming weight of the evidence." Foster v. State, 639 So.2d 1263, 1281 (Miss.1994) (citations omitted). "Where, on conflicting evidence, the court makes such findings, this Court generally must affirm." Lesley v. State, 606 So.2d 1084, 1091 (Miss. 1992) (citations omitted).
Hunter v. State, 684 So.2d 625, 633 (Miss. 1996).
¶ 16. In the case sub judice, the trial court's evaluation of the evidence and its ultimate resolution of the issue were as follows:
So based on all the relevant facts and circumstances and after the Court has had the opportunity to watch the witnesses as they testified and the Court has had the opportunity to examine the credibility of the witnesses while they are testifying, this Court is satisfied that the constitutional rights were read to Mr. Skinner prior to the time of him being asked any questions or showing the gun to the deputies.
The trial court also addressed the issue of whether Skinner understood his rights:

*1067 The Court also will note that Mr. Skinner at no time has ever testified that he did not understand his constitutional rights or that he was somehow ill-advised and did not know that he had the right to remain silent. There is no showing of any kind by Mr. Skinner that he did notthat he was mislead or that for some reason he was not aware of the right to remain silent. And the Court is satisfied that if he had not been aware of the right to remain silent he most assuredly would have testified to that fact today.
¶ 17. We are not naive about the potential of this factually grounded issue. Moreover, this issue may well have depths greater than Skinner has plumbed. For example, even if Skinner's right not to incriminate himself was violated by the admission into evidence of the rifle to which he led the two deputy sheriffs, the question would remain of whether the error was harmless because nothing about the rifle itself seems critically determinative of Skinner's guilt, especially in consideration of the State's evidence adduced from its several witnesses other than the two deputy sheriffs who established that it was Skinner who got a "long gun" from within his car, walked toward the front door of Ms. Flowers's mobile home, and began repeatedly firing the rifle. However that may be, the trial court made its findings of fact, i.e., that Deputy McIntyre completely Mirandized Skinner before he led the deputies to the rifle, on conflicting evidence; and as the standard of review allows, if not requires, this Court affirms the trial court's finding that Deputy McIntyre advised Skinner of his right not to incriminate himself before he located the rifle because the trial court's finding was not "manifestly in error, [nor] contrary to the overwhelming weight of the evidence." See Foster, 639 So.2d at 1281. We therefore resolve Skinner's second issue adversely to him and affirm the trial court's admission into evidence of the .22 rifle which Skinner used to shoot fatally Ms. Flowers.

B. Skinner's third issue

1. Basis in the record
¶ 18. Among the State's witnesses was Dr. Stephen Hayne, a forensic pathologist, who performed a post-mortem examination on Ms. Flowers's remains. Without objection Dr. Hayne offered the following testimony about two gunshot wounds to her body:
In addition [to four non-gunshot wound injuries] there were two entrance gunshot wounds. One gunshot wound was found over the right abdominal wall. There was a second gunshot wound that on internal examination proved to be the lethal gunshot wound. That gunshot wound was located over the right chest wall at a point thirteen inches below the top of the head and five inches to the right of the midline of the chest.
Skinner's counsel objected to the State's motion that a series of seven photographs of these wounds and of Ms. Flowers's head taken during the autopsy be admitted into evidence. The bass for the objection were that these photographs had "[n]o probative value" and that the "introduction of the pictures would tend to prejudice the jury and inflame the jury against the defendant." Another basis for the objection was that "[t]hese pictures are repetitive." Outside the presence of the jury, Dr. Hayne identified the content of each of these seven photographs. About the admissibility of these seven photographs, the trial judge opined:
The Court wants to go further on the record and state the Court has reviewed each one of these pictures outside the presence of the jury. The Court does not find any of them to be inflammatory. In fact, as far as autopsy pictures could possibly be there isI don't know the opposite of gruesome. But they are as clean as any photographs could be that would show a dead body and a gunshot wound to that body. The Court is of the opinion that the probative value of these *1068 photographs outweigh any prejudice that might befall the defendant by them being admitted. The Court will conditionally admit them upon Dr. Hayne testifying about what it is each of these photographs show.
¶ 19. The jury returned, and the State resumed its direct examination of Dr. Hayne by asking him to identify the contents of each photograph and to "tell ... what that photograph represents." Dr. Hayne explained that one photograph was of Ms. Flowers's face taken for the purpose of identifying the corpse and that the remaining six photographs depicted one or the other of the two gunshots wounds into her corpse. Dr. Hayne distinguished the photographs of the fatal and non-fatal wounds.

2. Skinner's argument
¶ 20. Before this Court Skinner renews his argument that the six photographs of the two wounds were "repetitive and nothing more than a concerted effort by the prosecution to keep the pictures before the jury and influence them in their ultimate decision." Skinner adds that these seven "photographs were entered into evidence without any explanation as to their probative value" contrary to the trial court's opining that the photographs "will not have any probative value unless they [are] actually explained to the jury."

3. Standard of Review
¶ 21. The determination of admissibility of photographs is a matter left to the sound discretion of the trial court. Brown v. State, 690 So.2d 276, 288 (Miss.1996); Blue v. State, 674 So.2d 1184, 1210 (Miss. 1996); Jackson v. State, 684 So.2d 1213, 1230 (Miss.1996); Chase v. State, 645 So.2d 829, 848 (Miss.1994); McNeal v. State, 551 So.2d 151, 159 (Miss.1989). Absent a clear abuse of that discretion, the reviewing court will uphold the trial judge's decision. Blue, 674 So.2d at 1210; Jackson, 684 So.2d at 1230; Chase, 645 So.2d at 848.
¶ 22. If they have probative value and serve a meaningful evidentiary purpose, photographs may be admitted regardless of their unpleasant nature. Hart v. State, 637 So.2d 1329, 1335 (Miss.1994) (citations omitted); Kniep v. State, 525 So.2d 385, 388 (Miss.1988). In assessing the admissibility of autopsy photographs, we reiterate the standard that photographs of victims' bodies may be admitted in criminal cases "where they have probative value and where they are not so gruesome or used in such a way as to be overly prejudicial or inflammatory." Sudduth v. State, 562 So.2d 67, 70 (Miss.1990) (citations omitted). Photographs are said to possess evidentiary value if they help describe the circumstances of the killing or the cause of death. Westbrook v. State, 658 So.2d 847, 849 (Miss.1995). Also, probative value exists when photographs "supplement or add clarity to witness' testimony." Gossett v. State, 660 So.2d 1285, 1292 (Miss.1995) (citing Hughes v. State, 401 So.2d 1100, 1106 (Miss.1981); see Norman v. State, 385 So.2d 1298, 1303 (Miss.1980)).
¶ 23. Regarding the potentially prejudicial effect, the Mississippi Supreme Court has noted that "our case law indicates that the decision of the trial judge runs toward almost unlimited admissibility regardless of the gruesomeness, repetitiveness, and extenuation of probative value." Robinson v. State, 662 So.2d 1100, 1105 (Miss.1995) (emphasis added), quoting Williams v. State, 544 So.2d 782, 785 (Miss.1987). Therefore, photographs of homicide victims have frequently been ruled admissible. Gossett v. State, 660 So.2d 1285, 1293 (Miss.1995) (photographs depicted victim of multiple shooting); Alexander v. State, 610 So.2d 320, 338 (Miss.1992) (autopsy photograph which depicted open skull of victim); Hewlett v. State, 607 So.2d 1097, 1102 (Miss.1992) (photographs of charred bodies of homicide victims).
¶ 24. The M.R.E. 403 restriction requires that a photograph be excluded if the probative value of the evidence is substantially outweighed by the danger of unfair *1069 prejudice. Kniep v. State, 525 So.2d 385, 388 (Miss.1988). However, the supreme court has stated, "At this point in the development of our case law, no meaningful limits exists [sic] in the so-called balance of probative/prejudicial effect of photographs test." Robinson v. State, 662 So.2d at 1105 (quoting Williams v. State, 544 So.2d 782, 785 (Miss.1987)).

4. Analysis and resolution of the issue
¶ 25. On appeal, Skinner incorrectly states that the photographs were entered into evidence "without any explanation as to their probative value." However, as we noted, the record discloses that Dr. Hayne explained briefly the content and relevance of each of the seven photographs immediately after the judge "conditionally" admitted them. Dr. Hayne's testimony satisfied the conditions for admitting these photographs, which corroborated and vivified Dr. Hayne's earlier testimony about the gunshot wounds which he found on Ms. Flowers's remains.
¶ 26. Skinner cites Noe v. State, 616 So.2d 298, 303 (Miss.1993), noting that the trial judge's discretion in admitting photographs is "not unfettered." In the Noe case, as in the present case, the defendant was convicted of murder. Id. The photographs introduced in Noe included one autopsy photograph depicting the face of the victim with an endotracheal tube protruding from the victim's mouth and two photographs depicting entrance and exit wounds and illustrating the location and size of the gunshot wounds sustained by the victim. Id. The supreme court discerned that "the photographs introduced here were neither inordinately gruesome nor inflammatory," and that they served a "meaningful evidentiary purpose in establishing the identity of the man shot by Noe and also the size, nature, and location of the gunshot wounds described by [the] coroner." Id. Opining that the probative value of the three photographs outweighed any prejudicial effect, the court affirmed the trial judge's admission of the photographs. Id.
¶ 27. The autopsy photographs in the case sub judice can also be described as "neither inordinately gruesome nor inflammatory." No medical instruments protrude from either wound, no blood surrounds the wounds, and there is no decomposition of the body. As the trial judge observed, "[T]hey are as clean as any photographs could be that would show a dead body and a gunshot wound to that body." Thus, this Court finds that the six photographs of the two gunshot wounds do not constitute evidence so repetitive that it incites undue prejudice. See Mack v. State, 650 So.2d 1289, 1314 (Miss.1994) (affirming admission of seven photographs depicting decedent's body at the scene, the body at the morgue, and the interior of the skull with scissors in bloody tissue where the brain would normally rest); Berry v. State, 575 So.2d 1, 9 (Miss.1990) (affirming admission of eleven autopsy photographs depicting wounds).
¶ 28. As for probative value, the photographs illustrate the proximity of the entrance gunshot wounds, the size of the wounds according to the calibrated ruler, and the relation of the chest wound to the shoulder and the chest wall. No doubt, these various perspectives assisted the jurors in their comprehension of the locations and proportions of the wounds which Dr. Hayne described in his testimony. See Hart v. State, 637 So.2d 1329, 1336 (Miss. 1994) (affirming admission where pathologist utilized like photos during testimony). See also Turner v. State, 573 So.2d 657, 667 (Miss.1990); Lanier v. State, 533 So.2d 473, 484 (Miss.1988) (both finding no abuse of judicial discretion in admitting photographs used in conjunction with testimony by the physician who performed the autopsy). This Court discerns no abuse of discretion by the trial court in admitting these seven post mortem photographs into evidence; thus, it resolves Skinner's third issue adversely to him and affirms the trial court's admitting the seven photographs into evidence.

*1070 C. Skinner's fourth issue

1. Skinner's argument
¶ 29. As his fourth issue, Skinner proposes that the trial court erred when it granted Instruction 3, to which Skinner's counsel objected because "the defendant feels that the State of Mississippi has failed to prove deliberate design." Instruction 3 reads as follows:
The defendant, Anderson Skinner, has been charged by an indictment in this case with the crime of the murder of Annie Lou Flowers.
If you find from all the evidence in this case beyond a reasonable doubt that:
1. Annie Lou Flowers was a living person, and
2. The defendant, Anderson Skinner, did wilfully, of his deliberate design, without the authority of law, and not in necessary self-defense either real or apparent, kill Annie Lou Flowers, by shooting her with a rifle,
then you shall find the defendant guilty of murder.
If the State has failed to prove beyond a reasonable doubt any one or more of the above elements, then you shall find the defendant not guilty of murder.
¶ 30. Skinner offers the following quotation from Strong v. State, 600 So.2d 199, 202 (Miss.1992) as authority for his argument:
As defined by dictionaries the word "deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate. These are general and accepted meanings of these words.
While it is no doubt true that a deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter.
Skinner relies on this quotation to assert that his "action [was] not a careful consideration of the consequences." Skinner continues:
Nor were his actions a plan or [were his actions] calculated to exact a death. The shots fired were a spontaneous defensive action prompted by the threat of serious bodily harm or death from the actions of [Ms. Flowers] with the knife.
¶ 31. Skinner's claim that "[t]he shots fired were a spontaneous defensive action" provoked by Ms. Flowers's actions "with the knife," refers to the testimony of Chris Merit, whom Skinner called as his witness. Merit testified that he stopped by Ms. Flowers's home to check on her before Skinner arrived. According to Merit, he left about ten minutes after Skinner arrived. Just after Merit exited the front door, he heard Ms. Flowers and Skinner begin to argue. Merit then testified that as he "got ready to get in [his] car, [he] heard someone stumbling." When he heard this, Merit "eased back to the window" in Ms. Flowers's home and peered through the bottom where "the window [was] just a little bit cracked." Merit saw that Ms. Flowers "had a knife in her hand," which she was "shaking" at Skinner. Merit described the knife as having a black handle. However, Merit acknowledged that he drove away from Ms. Flowers home before Skinner exited it and went to Skinner's car, from which he retrieved the rifle with which he shot Ms. Flowers. Also, in his recorded statement given Deputy McIntyre, which the State played for the jury, Skinner claimed that he retrieved his rifle from his car and was returning to her home when he began firing the rifle because she had threatened to injure him with a knife.

*1071 2. Analysis and resolution of the issue

¶ 32. It is axiomatic that "`[A]ll instructions must be supported by evidence' and if they are not, the instruction should not be given." Clark v. State, 693 So.2d 927, 933 (Miss.1997) (citations omitted). In Anderson v. State, 571 So.2d 961, 964 (Miss.1990), the supreme court elaborated:
The instruction may be denied only if the trial court can say, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences that may be drawn from the evidence in favor of the accused, that no hypothetical reasonable jury could find the fact as the accused suggests.
(citations omitted). Of course, the foregoing quotation applied to an instruction on self-defense which the accused requested but the trial court denied (Anderson, 571 So.2d at 961), but the concept is as applicable to the State as it is to Skinner.
¶ 33. The State's four witnesses who saw Skinner emerge from Ms. Flowers's home established that Skinner went to his car, retrieved a rifle from within it, returned toward the front door of Ms. Flowers's home, and began firing the rifle. While none of these four witnesses actually saw Skinner firing the rifle for one reason or another, the fact that Skinner left Ms. Flowers's home, retrieved the rifle from his car, returned toward Ms. Flowers's home, and began firing the rifle before he entered her home creates an inference that he had formed "a deliberate design" to kill Ms. Flowers even before he left her home en route to his car as Strong requires.
¶ 34. The cumulative testimony of the two deputy sheriffs was that there were eight bullet holes through the front door and a ninth bullet hole in the doorknob of the front door. Deputy McIntyre testified that he recovered six casings outside the front door of Ms. Flowers's home. Neither deputy recovered a knife from inside her home. Under cross-examination by the State, Chris Merit admitted that the window through which he claimed to have seen Ms. Flowers waving a knife at Skinner was mostly occupied by a small window-fan. These aspects of the evidence adduced for the jury's evaluation potentially cast doubt on Skinner's claim that he retrieved the rifle from his car and returned to defend himself.
¶ 35. The foregoing review of the evidence and inferences which might reasonably be drawn from that evidence persuades this Court that the State did not fail to offer evidence that Skinner had formed "a deliberate design" to kill Ms. Flowers before he began firing the rifle through her front door. Therefore, we affirm the trial court's granting Instruction 3.

D. Skinner's sixth issue

1. Skinner's argument
¶ 36. As his sixth issue, Skinner proposes that the trial court erred when it granted Instruction 5, to which Skinner's counsel objected because of "[t]he statement in there that deliberate design does not have to exist for any given length of time." Instruction 3 reads as follows:
The Court instructs the jury that deliberate design does not have to exist in the mind of the slayer for any given length of time. If the defendant, Anderson Skinner, acted with deliberate design formed before taking the life of Annie Lou Flowers, and said act was not in necessary self-defense either real or apparent, then it was truly deliberate design and the act was as truly murder as if the deliberate design had existed in the mind of the defendant for hours, days, weeks or even years.
¶ 37. The following quotation from Skinner's brief summarizes fairly his argument on this issue:
While Instruction [5] does not state that the deliberate design may have existed in the mind of Skinner at the very moment of the slaying, it does say that it *1072 "does not have to exist in the mind of the slayer for any given length of time." If there is no given length of time that it has to exist, then it could be said that it could be formed at the moment of the slaying.

2. Resolution of the issue
¶ 38. "A jury instruction may be improper if it incorrectly states the law...." Williams v. State, 667 So.2d 15, 24 (Miss. 1996) (citations omitted). In Windham v. State, 520 So.2d 123, 126 (Miss.1987), the supreme court explained:
While it is no doubt true that a deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act.
¶ 39. Instruction 5 did not instruct the jury that "a `deliberate design' can be formed at the very moment of the fatal act," the phrase which the supreme court condemned in Windham. Instead, Instruction 5 instructed the jury "that deliberate design does not have to exist in the mind of the slayer for any given length of time." Read in conjunction with Instruction 3, which required the jury to find "beyond a reasonable doubt that ... Skinner[] did wilfully, of his deliberate design,... kill Annie Lou Flowers, by shooting her with a rifle," before it could convict Skinner of murder, Instruction 5 further instructed the jury that the requisite "deliberate design [did] not have to exist ... for any given length of time."
¶ 40. In Strong, from which Skinner quoted in his brief, the Mississippi Supreme Court opined that "it is no doubt that deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent...." Strong, 600 So.2d at 202. Instruction 5's statement that "deliberate design does not have to exist ... for any given length of time" is consistent with Strong. Thus, Instruction 5 is a correct statement of the law, notwithstanding Skinner's argument, and we affirm the trial court's grant of Instruction 5.

E. Skinner's eighth issue

1. Basis in the record
¶ 41. In his eighth issue, Skinner complains about the trial court's refusal to grant Instruction D-12, which reads as follows:
The Court instructs the jury that while the danger which will justify the taking of another's life must be imminent, impending, and present, such danger need not be unavoidable except by killing in self defense. The defendant, Anderson Skinner, need not have avoided the danger to his person presented by the deceased, Annie Lou Flowers, by flight. So long as the defendant was in a place where he had the right to be and was neither the immediate provoker or aggressor, he may stand his ground without losing the right of self defense.
¶ 42. The following colloquy occurred among the judge, prosecutor, and defense counsel about the propriety of granting instruction D-12 during their conference about the instructions:
BY THE COURT: Okay. What about D-12?
BY DEFENSE COUNSEL: I think D-12 is one of the standard ground instructions.
BY THE PROSECUTOR: It would be proper if there was a question about whether or not the defendant had authority and I don't think that is the case here. This is not a case where the defendant had a right to be. He had already been told to leave. He admits as much. He went to the car, got his gun and came back. So he was not in a place he had a right to be. This is not whetherthere islast part of it says and was neither the immediate provoker *1073 or aggressor and he cannot claim he wasn't a provoker or aggressor
BY THE COURT: I agree with the State on this. [Skinner] was at her home. He didn't have any right to be there. She asked him to leave and that was it. The end of that. Well, all the testimony is that he shot through the door of her house and killed her so I don't think that this is a proper instruction. It will be refused.

2. Skinner's argument
¶ 43. Skinner cites Craig v. State, 660 So.2d 1298 (Miss.1995), and Catchings v. State, 684 So.2d 591 (Miss.1996) in his argument on this issue. In Craig, the supreme court reversed the appellant's conviction of manslaughter because the trial court refused to grant a "stand your ground" instruction composed nearly identically to Instruction D-12 in the case sub judice. Craig, 660 So.2d at 1301. In Catchings, the supreme court found no evidence in the record to support the granting of essentially the same "stand your ground" instruction, held that the trial court correctly denied the appellant's request for this instruction, and affirmed the appellant's conviction of murder. Catchings, 684 So.2d at 595-96.
¶ 44. Skinner's review of the evidence on which he relies to base his argument that the trial court erred when it failed to grant Instruction D-12 concedes that "Skinner did leave the house of the decedent." Skinner further concedes that he "did not return into the home of the decedent" and that "[h]e armed himself with a .22 rifle from his car." Skinner relies on the recorded statement which the Montgomery County Deputy Sheriffs obtained from him after he had slain Ms. Flowers and which was played to the jury to support his assertion that "[a]s he approached the house, the decedent again threatened him with the knife[,] and he shot her in self defense." Skinner also reminds this Court that the witness whom he called, Chris Merit, "said that the decedent was the provoker when she began shaking a knife at Skinner." The State's rebuttal to Skinner's argument consists primarily of an evaluation of its evidence by which it seeks to persuade this Court that its evidence was so overwhelming on this issue that the trial court did not err when it refused to grant Skinner's requested Instruction D-12, his "stand your ground" instruction.

3. The criminally accused's burden
¶ 45. In Talbert v. State, 347 So.2d 352, 353 (Miss.1977), in which the appellant was convicted of murder, the issue was whether the testimony of a local physician who had examined the victim before he died was sufficient to meet the State's burden of proving beyond a reasonable doubt that the cause of the victim's death were the various injuries to his head. Talbert argued that because the victim died in a Memphis hospital after the local physician had examined him, the local physician's "testimony was not sufficient to establish the cause of death." Id. The supreme court rejected Talbert's argument and concluded "that the state properly established the cause of [the victim's] death." Id. at 354. The court explained:
In Mississippi the burden of proof never shifts from the prosecution in a criminal case. However, the defendant has the duty to go forward in presenting evidence to substantiate matters raised in defense. We hold that Talbert had the duty to go forward and present evidence from which the jury could infer an intervening cause of death.
Id. at 384 (citations omitted). "Likewise, the defendant is not required to prove that he acted in self-defense, and, if a reasonable doubt of his guilt arises from the evidence, including the evidence of self-defense, he must be acquitted." Sloan v. State, 368 So.2d 228, 229 (Miss.1979).
¶ 46. In summary, while the burden of proof always remained on the State to prove that Skinner was guilty of the murder of Ms. Flowers beyond a reasonable doubt, Skinner's evidence that he *1074 shot Ms. Flowers in self-defense need only create a reasonable doubt that he was guilty of her murder. Nevertheless, "[a] trial court need not consider a defense which is not supported by any evidence." McMillan v. City of Jackson, 701 So.2d 1105, 1108 (Miss.1997). In the case sub judice, the trial court denied Instruction D-12 because, "[A]ll the testimony is that [Skinner] shot through the door of her house and killed her so I don't think that this is a proper instruction. It will be refused." We interpret the judge's statement to mean that there was no evidence to support the granting of this instruction. Unless this Court can find any evidence to support Instruction D-12, we will affirm the trial judge's denial of this instruction.

4. The right to "stand your ground" as a matter of self-defense
¶ 47. In Craig v. State, 660 So.2d 1298, 1300 (Miss.1995), the supreme court quoted from Long v. State, 52 Miss. 23, 34 (1876), the apparent wellspring of self-defense instructions like Instruction D-12, to "explain[] the circumstances under which an individual may stand his ground and still be entitled to claim self-defense":
Flight is a mode of escaping danger to which a party is not bound to resort, so long as he is in a place where he has a right to be, and is neither engaged in an unlawful act, nor the provoker of, nor the aggressor in, the combat. In such case he may stand his ground and resist force by force, taking care that his resistance be not disproportioned to the attack.
In at least two cases, Cook v. State, 467 So.2d 203, 210-11 (Miss.1985), and Haynes v. State, 451 So.2d 227, 229 (Miss.1984), the supreme court reversed the appellants' convictions of manslaughter because the trial judge refused to grant instructions nearly identical to Instruction D-12. In Cook, the court noted "that Cook was on premises not his home but where he nevertheless had a right to be, and ... that [Cook] did not flee as [the deceased] approached." Cook, 467 So.2d at 210. In Haynes, the supreme court observed that "[t]here was some testimony by Haynes that he began to walk away when the trouble started...." Haynes, 451 So.2d at 229. In both cases, the supreme court conducted an analysis of the evidence in the record, pursuant to which it found evidence that supported the grant of this "stand your ground" instruction and thus reversed and remanded the convictions. These two cases and Craig demonstrate that whether to grant such an instruction is a fact sensitive issue.

5. Review of the evidence and resolution of the issue
¶ 48. In the beginning of our review of this issue, we noted that Skinner appeared to acquiesce to the facts established by the State's at-the-scene witnesses that he left Ms. Flowers's home, armed himself with a .22 rifle from his car, but "did not return into the home of the decedent." Although the State did not raise the issue either at trial or on appeal, this Court is mindful that "one who leaves an altercation, arms himself, and returns with the intent to and does use his weapon on the other party cannot claim self-defense." Griffin v. State, 495 So.2d 1352, 1354 (Miss.1986). Indeed, the record in the case sub judice reflects that the trial court granted an instructionrequested by the Statethat permitted the jury to find Skinner not guilty if he shot Ms. Flowers in self-defense.
¶ 49. Our task remains to identify any evidence in the record that would have supported the granting of Instruction D-12. Aside from Skinner's recorded statement which was played to the jury, in which he claimed that Ms. Flowers was waving about "[w]hen I went out the door," the only other evidence of Ms. Flowers's brandishing a knife came from the testimony of Chris Merit, which we previously reviewed. However, Merit testified that he left Ms. Flowers's home while Skinner was still inside it. As Merit *1075 admitted under the State's cross-examination, he saw nothing after he left Ms. Flowers's home.
¶ 50. In our review of Skinner's fourth issue, we determined that the State had adduced sufficient evidence of Skinner's having formed the "deliberate design" before he fired repeatedly the rifle through Ms. Flower's front door. We reserved for our review of this issue the following portion of Skinner's counsel's cross-examination of Dr. Hayne, the pathologist to perform the post mortem examination of Ms. Flowers' remains. Dr. Hayne acknowledged that the two slugs which he recovered from her remains were "mushroomed." Dr. Hayne testified that neither bullet struck bone and that each bullet's passing through flesh "could" cause the bullet "to mushroom or flatten out." Then, Dr. Hayne added that each bullet "could pass through an intermediate target also."
¶ 51. Dr. Hayne's opinion that the "mushroom" shape of the projectiles which he recovered from Ms. Flowers's corpse could have been caused by "pass[ing] through an intermediate target" supports the inference from all of the State's evidence that Skinner fired no less than nine times through the front door of Ms. Flowers's residence. The testimony of Skinner's sole witness, Chris Merit, that he observed Ms. Flowers waving a knife around Skinner before Merit left the premises, even when it is combined with Skinner's statement to the deputy sheriffs that Ms. Flowers had threatened him with a knife is simply no evidence that Skinner was not the aggressor when he fired his rifle nine times through the front door of Ms. Flowers's home. This is true regardless of whether Skinner had the right to be standing outside the front door in Ms. Flower's yard when he fired.
¶ 52. Moreover, while the Long court opined that an accused may "stand his ground and resist force by force," the accused must "tak[e] care that his resistance be not disproportionate to the attack." Long, 52 Miss. at 34. This Court can find no evidence in the case sub judice that would support Skinner's firing nine times through the closed front door to ward off an attack by a knife-wielding Ms. Flowers as she stood behind the closed door. This Court can only conclude that Skinner's repeated firing of his rifle under these circumstances constituted a "disproportionate" resistance to Ms. Flowers's attack with the knife. Because we can find no evidence to support the proposition that Skinner was not the aggressor, and because the evidence adduced by the State placed a closed door between Skinner and Ms. Flowers, which rendered his repeated firing of the rifle a "disproportioned" resistance to any attack that she might otherwise have been able to make, we affirm the trial court's refusal to grant Instruction D-12. As we noted, the trial court granted an instruction under which the jury might consider whether Skinner had acted in self-defense.

F. Skinner's ninth issue

1. Factual basis
¶ 53. In his ninth issue, Skinner contends that the following event which happened while two policemen were escorting him from the courthouse to the jail after his trial was over "constitute[d] evidence of perjury and conspiracy to unlawfully convict [him]." Because of the following occurrence, Skinner asserts that the trial court erred when it denied his motion for a new trial.
¶ 54. According to Skinner's testimony which he gave at a hearing conducted by the trial court on his motion for new trial, Skinner overheard the following conversation between Charlie Lane, who testified for the State, and Napoleon Butts, the brother of Ms. Flowers, whom the State had called as its rebuttal witness to discredit Chris Merit's testimony that he had seen Ms. Flowers waving a knife at Skinner when he peered through a particular window. Butts had testified that a window *1076 fan occupied part of the window and that curtains hung on either side of the window fan, all of which would obscure Merit's view of the interior of Ms. Flowers's home.
¶ 55. According to Skinner, Charlie Lane told Napoleon Butts, "Man, this is not what you promised." Butts replied, "Well, we got the job done, didn't we?" Napoleon Butts "had a wallet in his hand," but Skinner admitted that he "didn't see no [sic] money." Skinner further testified that he "tried to show it to the police, "but they was [sic] carrying on a lot of junk. They wasn't [sic] paying any attention." The State's first question to Skinner under its cross-examination was, "Mr. Skinner, you don't know what they were talking about, do you?" Skinner replied, "No, I did not."
¶ 56. Napoleon Butts was the State's first witness. He testified that he gave Charlie Lane five dollars to pay Lane to put gasoline in Lane's car so that Lane could drive to Butts's house to see about "putting some filling in up under the bottom of [his] porch and painting around the trim of my porch." Butts denied that his giving Lane five dollars had anything to do with Skinner's trial. Charlie Lane's testimony corroborated Butts's testimony. Lane explained that because he was on a fixed income, he needed the "gas" money to drive to Butts's house after he had driven his wife to Eupora, where she had supervised cheerleader practice as cheer-leader coach. We quote from Lane's testimony, "Didn't nobody [sic] promise nobody [sic] nothing [sic] about no [sic] court, lying or nothing." The State's third and final witness was Winona Policemen Mike Herring, one of the two officers who had escorted Skinner from the courthouse to the police car en route to the Montgomery County jail. The essence of Officer Herring's testimony was that while he had noticed the group standing and laughing nearby, he neither heard nor saw anything unusual occur.
¶ 57. After he heard the foregoing testimony and argument from both Skinner's counsel and the assistant district attorneys, the judge stated that he had taken "special note of Mr. Skinner's statement on cross examination when he stated, `What they were talking about, I really do not know.'" Next, the judge noted that both "Mr. Butts and Mr. Lane have ... explained what they were, in fact, talking about." The judge did not find "that any of the testimony here today would in any way tend to impeach the verdict or any of the witnesses that have testified ... in this trial...." Therefore, he denied Skinner's motion for new trial on this ground.

2. Standard of review
¶ 58. In reviewing the denial of a motion for new trial asserting the grounds of newly discovered evidence, our scope of review is limited to whether the trial judge abused his discretion. Ormond v. State, 599 So.2d 951, 962 (Miss.1992); Gaston v. State, 562 So.2d 61, 63 (Miss. 1990); Moore v. State, 508 So.2d 666, 668 (Miss.1987). To grant a new trial, the trial judge should determine that admission of the new evidence would probably result in a different outcome, that the evidence was discovered after the trial, and that the evidence could not be discovered earlier by exercising due diligence. Gaston v. State, 562 So.2d 61, 63 (Miss.1990); Moore v. State, 508 So.2d 666, 668 (Miss.1987); Shelby v. State, 402 So.2d 338, 340-341 (Miss.1981) (citations omitted).
¶ 59. The trial judge must first determine "whether the petitioner has sufficiently proved the underlying allegations of perjury." Moore, 508 So.2d at 668. However, even if sufficiently proved, perjured testimony does not necessarily require a new trial. Moore, 508 So.2d at 668. To compel a new trial, the new evidence must be material to the issue and should not be merely cumulative or impeaching evidence. Ormond v. State, 599 So.2d 951, 962 (Miss.1992). Accordingly, "[t]he determination of whether a new trial should be granted must be made by the trial judge on a case by case basis, taking *1077 into account all the relevant facts and circumstances." Moore, 508 So.2d at 668.

3. Analysis and resolution of the issue
¶ 60. Our review of the evidence adduced by Skinner during the trial court's hearing on this ground for a new trial reveals that Skinner wholly failed to prove "the underlying allegations of perjury." Skinner did nothing to impeach Butts and Lane's explanation of their conversation which Skinner overheard as he was being escorted from the courthouse to the county jail. There is nothing in the record of the hearing on Skinner's motion for new trial that establishes any new evidence of any sort, much less any "new evidence [that] would probably result in a different outcome" of Skinner's trial. Application of the previously discussed standard of review to the evidence which Skinner adduced requires that we hold that the trial court hardly abused its discretion in denying his motion for a new trial; hence we affirm the trial court's denial of Skinner's motion for new trial based upon "evidence of perjury and conspiracy to unlawfully convict Skinner."

III. SUMMARY
¶ 61. All six of Skinner's issues on which he offered argument were evidentiary matters. The trial court found that Deputy McIntyre fully advised Skinner of his right not to incriminate himself before Skinner led them to the location of the .22 caliber rifle even though Skinner denied that the deputy sheriff had first advised him of that right. It was the judge's duty to determine the credibility of these witnesses, and as the supreme court opined in Lesley v. State, 606 So.2d at 1091, "Where, on conflicting evidence, the court makes such findings, this Court must affirm." Nor did the lower court abuse its broad discretion in admitting the autopsy photographs. The trial court did not err in granting Instructions S-1 and S-3 because the State had adduced sufficient evidence to establish that Skinner had formed a "deliberate design" to kill Ms. Flowers before he had begun firing his rifle through her front door, which the evidence indicated was closed. Instruction S-3 was not an incorrect statement of the law. Neither was there any evidence, as the trial court correctly evaluated, to support Skinner's request that it grant Instruction D-12, his "stand your ground" self-defense instruction. As for Skinner's ninth and final issue, this Court concurs with the trial court's evaluation of Skinner's evidence as being insufficient to warrant its granting his motion for a new trial based upon "evidence of perjury and conspiracy to unlawfully convict Skinner." This Court affirms the trial court's judgment of Skinner's conviction of the crime of murder and its sentence of Skinner "to serve the remainder of his natural life in the custody of the Mississippi Department of Corrections."
¶ 62. THE JUDGMENT OF THE CIRCUIT COURT OF MONTGOMERY COUNTY OF APPELLANT'S CONVICTION OF MURDER AND ITS SENTENCE OF APPELLANT TO SERVE THE REMAINDER OF HIS NATURAL LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MONTGOMERY COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, DIAZ, IRVING, LEE, PAYNE, AND THOMAS, JJ., CONCUR.