934 So.2d 330 (2006)
Willie J. GILBERT a/k/a "Brownie", Appellant,
v.
STATE of Mississippi, Appellee.
No. 2004-KA-02080-COA.
Court of Appeals of Mississippi.
April 4, 2006.
Rehearing Denied July 25, 2006.
*333 John Carl Helmert, Clarksdale, attorney for appellant.
Office of the Attorney General by Jose Benjamin Simo, attorney for appellee.
EN BANC.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. Willie Gilbert was convicted of murder in the Lee County Circuit Court and sentenced to serve a life term in the custody of the Mississippi Department of Corrections. Posttrial, Gilbert filed an unsuccessful motion for judgment notwithstanding the verdict. Aggrieved, Gilbert appeals and raises eight issues:
I. The evidence against him was insufficient to sustain a conviction for murder.
II. The trial court erred when it overruled his request for a Weathersby instruction.
III. The trial court erred when it excluded evidence submitted by Gilbert.
IV. The trial court erred when it overruled Gilbert's challenge under Batson.
V. The trial court erred when it sustained the State's request for a flight instruction.
VI. The indictment did not allege the essential elements of murder.
VII. The trial court erred when it overruled Gilbert's request for a continuance for the purpose of locating eyewitnesses.
*334 VIII. The cumulative effect of these errors denied Gilbert a fair trial.
Finding no error, we affirm.

FACTS
¶ 2. Sometime between 12:30 and 1:00 a.m. on the night of July 13, 2003, Enoch "Conrad" Townsend died from the chest wound inflicted by Willie J. "Brownie" Gilbert's 7.62 mm 30/30 caliber high powered rifle. Gilbert shot Townsend at an apartment complex in the Shannon community of Lee County. Gilbert was subsequently indicted and stood trial for murder on August 18 and 19, 2004. The case went to the jury on the State's theory of murder and on the lesser-included offense of manslaughter by culpable negligence. The jury returned a unanimous verdict of murder.
¶ 3. The State presented only three witnesses: Andrew Long, patrolman with the Shannon Police Department; Derrick Adams, a former friend of Gilbert and an eyewitness to the homicide; and Dr. Steven T. Hayne, the forensic pathologist who performed Townsend's autopsy.
¶ 4. Derrick Adams testified that he was in his living room when he heard Gilbert say to Townsend, "You don't believe I will kill you, do you?" Adams testified that he then looked out of his screen door and saw Gilbert, armed with a rifle. According to Adams, Gilbert, stood over a seated Townsend. Adams testified that Gilbert had the rifle leveled at Townsend. Adams heard Townsend say, "You won't kill a flipper flop fan. Get that gun out of my face." Adams's testimony indicated that Townsend "eased" Gilbert's rifle away and that Gilbert stepped back and shot Townsend. Adams testified that Gilbert held the rifle with one hand and that the discharge caused the rifle to swing around and hit Corey Fells in the head. Adams also testified that, after Gilbert shot Townsend, Gilbert slowly walked away.
¶ 5. Dr. Hayne's testimony corroborated Adams's. Dr. Hayne testified that: (a) the path of the bullet indicated that Townsend was seated when Gilbert shot him; (b) Gilbert shot Townsend from the side; and (c) Townsend was not facing Gilbert in an offensive stance when Gilbert shot Townsend.
¶ 6. Officer Andy Long's testimony also corroborated Adams's testimony. Officer Long testified that he arrived at the scene and found Townsend lying on the ground near an overturned chair. Officer Long also testified that he found the fatal 7.62 mm projectile in the ground a couple of feet from the overturned chair. Officer Long testified that Townsend was alive at that time and that Townsend said Gilbert shot him.
¶ 7. Gilbert presented four witnesses: Delois Williams, his fiancee; Cory Fells, Gilbert's friend and an eyewitness; Calvin Williams, Gilbert's friend and the brother of his fiancee, as well as an eyewitness; and himself. Gilbert's witnesses testified that Gilbert killed Townsend as a result of an accident or misfortune.

ANALYSIS

I. DID THE TRIAL COURT ERR WHEN IT OVERRULED GILBERT'S REQUEST FOR A JUDGMENT NOTWITHSTANDING THE VERDICT PURSUANT TO THE WEATHERSBY RULE?
¶ 8. Gilbert argues that the trial court erred when it denied his motion for JNOV because he, Fells and Williams were the only eyewitnesses to the killing and they all testified that Gilbert accidentally shot Townsend. Gilbert claims that the Adams was the only witness who testified that Gilbert murdered Townsend. Gilbert *335 submits that Adams was not a credible witness. Further, Gilbert claims that the trial court should have applied the rule set forth in Weathersby. The State disagrees and submits that the rule in Weathersby does not apply, because physical evidence and Adams's testimony contradicted Gilbert's version of events.
¶ 9. A motion for a judgment notwithstanding the verdict is a challenge to the sufficiency of the evidence. In reviewing a sufficiency of the evidence claim, the Court considers the evidence in the light most favorable to the verdict. Bush v. State, 895 So.2d 836, 844(¶ 16) (Miss.2005). If any reasonable trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we will uphold the verdict. Id.
¶ 10. If a defendant and his eyewitnesses give a reasonable account of a killing, which is not substantially contradicted in material particulars by credible witnesses, the defendant's conduct after the killing, physical evidence, or facts in common knowledge, the Weathersby rule applies. Green v. State, 631 So.2d 167, 174 (Miss.1994); Harveston v. State, 493 So.2d 365, 370-71 (Miss.1986). The Weathersby rule requires the court to direct a verdict of acquittal, if the defendant's account affords an absolute legal defense. Green, 631 So.2d at 174. Whether the Weathersby rule applies is a question for the court, not the jury. Id. at 175. Nevertheless, witness credibility is left for the jury to assess. Id. Therefore, a court is not required to assess credibility before it denies a Weathersby directed verdict. Id.
¶11. Gilbert and his witnesses presented a defense theory based on accident or misfortune. "The killing of any human being ... shall be excusable: (a) [w]hen committed by accident or misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." Miss.Code Ann. § 97-3-17(a) (Rev.2000). By Gilbert, Fells, and Williams's accounts, Gilbert was holding the gun in self-defense, because he reasonably feared imminent danger from Townsend and a possible weapon, but when Gilbert shot Townsend, that was an accident.
¶ 12. However, the accounts of Gilbert, Fells, and Williams were contradicted by physical evidence. Dr. Hayne testified that the fatal shot traveled from the right side of Townsend's chest, through Townsend's chest cavity, and exited through the left side of Townsend's chest. Dr. Hayne indicated Townsend was not in a fighting stance when Gilbert killed him. Dr. Hayne also opined that Townsend was seated when Gilbert shot him, because the bullet traveled at twenty to thirty degree downward angle. Despite the fact that Gilbert was taller than Townsend, Dr. Hayne testified that their height difference was not enough to create that same trajectory if both were standing at the time. Officer Long and Adams corroborated Dr. Hayne's testimony. Officer Long testified that, when he arrived at the scene, Townsend was on the ground next to an overturned chair. Adams testified that Townsend was seated when Gilbert shot him.
¶ 13. The physical evidence and collective testimony of Officer Long, Adams and Dr. Hayne substantially contradicted Gilbert's version of events. Testimony that Townsend sat in a chair and faced away from Gilbert and that Gilbert stepped back and then shot Townsend created a jury issue as to whether Gilbert shot Townsend by accident. The lower court did not abuse his discretion in refusing a Weathersby directed verdict. It was the job of the jury to decide which of these accounts were more credible. Green v. State, 631 So.2d at 174.

*336 II. DID THE TRIAL COURT ERR WHEN IT OVERRULED GILBERT'S REQUEST FOR A WEATHERSBY INSTRUCTION?
¶ 14. As stated above, whether Weathersby applies is a question for the court, not the jury. Green, 631 So.2d at 175. The trial court found, and we agree, that Gilbert's self-defense evidence was substantially contradicted by the State's evidence. This issue has no merit.

III. DID THE TRIAL COURT ERR WHEN IT EXCLUDED PORTIONS OF FLOYD WILLIAMS'S TESTIMONY ON THE BASIS THAT IT WAS INADMISSIBLE HEARSAY?
¶ 15. This issue centers around the premise that Gilbert and Townsend had words prior to Gilbert's shooting Townsend. Through Adams, the State presented evidence, without objection, that Gilbert told Townsend, "you don't believe I'll kill you" before he shot him. During Gilbert's case-in-chief, Gilbert called Floyd Williams as a witness and, on redirect, attempted to ask him whether he heard Gilbert threaten to kill Townsend. Williams began to testify as to what Townsend said when the State objected on the basis of hearsay. Defense counsel argued that the State brought the matter up on cross-examination. The trial judge pointed out that the State brought the matter up without objection from Gilbert. Defense counsel conceded that he did not object to the State's question during cross-examination. Ultimately, the trial judge sustained the State's hearsay objection.
¶ 16. On appeal, Gilbert complains that the trial judge, by sustaining the State's hearsay objection, violated Gilbert's right to call witnesses on his behalf and rendered his trial fundamentally unfair. The State does not defend this ruling or even address this issue in its brief. This wholesale failure to address the issue is tantamount to a confession of error. Trammell v. State, 622 So.2d 1257, 1261 (Miss.1993). That, however, does not mean we must find reversible error.
¶ 17. Under this Court's standard of review, the admissibility of evidence rests within the trial court's discretion. Burton v. State, 875 So.2d 1120(¶ 6) (Miss.Ct.App.2004). Abuse of discretion will only be found where a defendant shows clear prejudice resulting from an undue lack of constraint on the prosecution or undue constraint on the defense. Id. This Court shall not disturb a trial court's decision unless it is clearly wrong. Id. Additionally, we will not reverse an erroneous decision to exclude evidence unless the error adversely affects a substantial right of a party. Perry v. State, 904 So.2d 1122(¶ 7) (Miss.Ct.App.2004).
¶ 18. Even if we were to find that the trial judge abused his discretion in sustaining the State's hearsay objection, Williams was allowed to testify that it was Townsend who was talking about killing Gilbert. Williams's point that Townsend was the aggressor and was threatening Gilbert's life was made to the jury. What is more, Gilbert never argued that he killed Townsend in self-defense. If anything, Gilbert argued that he retrieved his rifle in self-defense, but he shot Townsend accidentally. In this case, exclusion of the exact statement was harmless error.

IV. DID THE TRIAL COURT ERR WHEN IT DENIED GILBERT'S BATSON CHALLENGE?
¶ 19. During jury selection, counsel for Gilbert stated, "Your Honor, at this point the defense would like to make a Batson challenge regarding the State's use of its peremptory challenges, particularly as to prospective Juror No. 1, Linda Agnew. Ms. Agnew is an African American lady, as the defendant is an African American *337 man." After discussion, the trial judge held, "[t]he defendant has not met his burden of showing a pattern of discrimination against black jurors." Aggrieved, Gilbert appeals.
¶ 20. In Batson v. Kentucky, 476 U.S. 79, 96, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) the United States Supreme Court held that a defendant may establish a prima facie case of purposeful discrimination during jury selection based solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish the prima facie case under Batson, a defendant must demonstrate three elements: (1) that the defendant is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges toward the elimination of veniremen of his race; and (3) that facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities. Tanner v. State, 764 So.2d 385 (¶ 12) (Miss.2000).
¶ 21. "Once the defendant sets forth a prima facie case, the burden shifts to the State to come forward with a race-neutral explanation for challenging the jurors." Id. at (¶ 13) (internal quotations omitted). "The trial court must then determine whether the objecting party has met its burden of proving there has been purposeful discrimination in the exercise of the peremptory challenge." Id. "[G]reat deference is given the trial court when determining whether the offered explanation under the unique circumstances of a case is truly a race-neutral reason." Id. at (¶ 14). "Accordingly, we will not reverse a trial judge's factual findings on this issue unless they appear clearly erroneous or against the overwhelming weight of the evidence." Id.
¶ 22. The State exercised two of its peremptory strikes on black veniremen. Additionally, one member of the jury was black and one alternate was black. The number of peremptory strikes which the State used against the minority members, standing alone, is insufficient to establish an inference to a pattern of purposeful discrimination. Dennis v. State, 555 So.2d 679, 681 (Miss.1989) (ruling that the appellant had not established that an inference of purposeful discrimination by the prosecution solely on the number of peremptory challenges the State used against black members of the jury pool).
¶ 23. We hold that no prima facie case of racial discrimination has been shown in this case. To establish such a case, the defendant must show, among other things, that the State's use of peremptory challenges and any other relevant circumstances raise an inference that the State excluded prospective jurors on the basis of their race. Here, Gilbert simply stated that, by exercising peremptory strikes on two black veniremen, the State exercised its peremptory strikes in a racially discriminatory manner. Instead of demonstrating a prima facie case of racial discrimination, counsel for Gilbert noted that the State exercised two of its peremptory challenges on two black veniremen and then asked the trial judge to have the State give race-neutral reasons for its strikes. When we examine all of the facts and circumstances surrounding the case, they simply fail to create an inference that the prosecution purposefully and intentionally struck potential jurors solely because they were black. The State accepted one black juror and one black alternate. The State also exercised most of its peremptory strikes on white people. We find no error and affirm.

V. DID THE TRIAL COURT COMMIT PLAIN ERROR WHEN IT GRANTED THE STATE'S REQUEST FOR A FLIGHT INSTRUCTION?
¶ 24. Gilbert argues that the court was in error for instructing the jury *338 that it could take his flight after the shooting as evidence of his guilt. The State argues that the issue is waived, or in the alternative, the trial judge's decision to grant the flight instruction is not erroneous.
¶ 25. In determining whether error lies in the granting of jury instructions, the instructions must be read as a whole. Johnson v. State, 823 So.2d 582, 584(¶ 4) (Miss.Ct.App.2002). "When so read, if they fairly announce the law of the case and create no injustice, no reversible error will be found." Id. However, it is reversible error to grant a flight instruction when the defendant is claiming self-defense. Tran v. State, 681 So.2d 514, 519 (Miss.1996). As the supreme court has explained:
Where the defendant is arguing self-defense, a flight instruction should be automatically ruled out and found to be of no probative value .... To suggest and highlight, through the sanction of a court granted instruction, that the defendant's flight was possibly an indication of guilt suggests that the court does not accept the self-defense argument.
Banks v. State, 631 So.2d 748, 751 (Miss. 1994).
¶ 26. In Tran v. State, the court held that since Tran argued self-defense, and the jury heard evidence of his flight, it was free to draw its own conclusion as to the weight of that evidence. Tran, 681 So.2d at 519. The court held that the effect of the flight instruction was error, because it amounted to an improper comment on the evidence and called "undue attention to Tran's flight." Id.
¶ 27. In his opening statement to the jury, defense counsel did not even argue that the killing was in necessary self-defense. Gilbert gave a written statement to law enforcement four days after the shooting. In that statement, Gilbert made no claim that he felt threatened or that his life was in danger, nor did he claim that he thought Townsend had a gun or weapon in his pocket which forced him to use deadly force. Neither the assistant district attorney nor defense counsel mentioned Gilbert's flight from the scene until the prosecutor's last few remarks in closing in which he said:
And here is what any normal person would do: A normal person wouldn't rush off and try to hide. A normal person would say, oh, my God. Oh, my God, what have I done? And call the police, call an ambulance, call 911, and say I just shot somebody, come help them, come give them aid, come take them to the hospital. No. Like the coward he is, he took off and ran. Now, he didn't want people to know about that gun. He didn't want people to find the gun and be able to use it in this courtroom as evidence against him. He wanted to get rid of it. Did he get rid of it? You heard his testimony. He got rid of that gun, and he didn't go to the police the next day, as far as I know, not the next day.
¶ 28. To highlight the fact that Gilbert's primary defense was accident or misfortune, Corey Fells testified:
Q. Did Conrad Townsend make any movement toward the gun?
A. Yeah, he did like that right there. Hit the gun up, the gun hit me in the forehead. As soon as the gun hit me in the forehead, it went off. Just like that.
Q. The gun hit you in the forehead?
A. Hit me in the forehead.
Q. After Mr. Townsend pushed it away?
A. After he pushed it away. When he hit it, the gun hit me. As soon as it hit my forehead, it went off. It's just *339 that fast. You know, a blink of an eye, you missed it.
* * * *
Q. He was standing so close to you when he shot Conrad Townsend that the barrel hit you in the head?
A. He wasn't standing that close to me. The gun was long, you know what I'm saying. How he was standing, the gun was going across like that right there, across like that right there. (Indicating.)
Q. You were standing close enough to him that when the gun went off it hit you in the head; is that right?
A. Well, I was standing  Conrad hit the gun. How he hit the gun, the gun come back like this right here. The gun hit my head. As soon as the gun hit my forehead, the gun went off.
Calvin Williams testified similarly about an accident and the reason Gilbert ran.
Q. And there is no question in your mind before that gun  before Willie went to get that gun, that they had had words?
A. Yes, sir.
Q. Conrad [Townsend] was yacking at him, he was yacking at Conrad. I'll kill all you MF's. And then Willie Gilbert went all the way to his car, opened the trunk, got the gun out. Didn't take  didn't say, hey, man, I am getting in trouble; I got to defend myself. Hey, man, this may be something bad. I don't want to get involved in it. This is a time for me to leave and not go get a gun and come back. Instead he walked to his trunk of his car and he got that gun. Now that's no question in your mind that he did that, is there?
A. Yes, sir.
* * * *
Q. Right by the chair, the chair that's right here. Now, you were high, and you saw what you wanted to see. Everything was fine. And you didn't want Willie [Gilbert]  you didn't want Willie to be a murderer. You wanted to have this story that the gun accidentally went off. Isn't that what you wanted?
A. The gun accidentally did went off.
* * * *
Q. And he ran because he knew he had shot and killed Conrad [Townsend], didn't he?
A. (Inaudible)
THE REPORTER: I'm sorry. I didn't hear your response.
A. Yes, sir.
¶ 29. Gilbert also testified that the shooting was an accident. Gilbert testified:
[Townsend] told me, he said like, you ain't got the guts to shoot nobody, you punk motherf____. Then when he hit it, like I said, the gun did, it went off. I didn't  I had no intention of killing nobody. I ain't never had that intention to kill nobody. I'm not a murderer.
Gilbert explained his flight from the scene:
Q. You didn't stick around?
A. No, I didn't stick around.
Q. Why?
A. Because I didn't have no reason to stick around. Was that after the accident or before the accident did I stick around?
Q. After the accident?
A. Oh, no, sir. I panicked. I  you know, I panicked. I ran, you know. It  it shocked me. It scared me, you know. I mean, I  I  I thought, you know what I'm saying. I maybe  I  I told him, I said, God  I told my wife when I got home, I said, Lord I hope *340 I ain't shot  shot  I hope it ain't bad. I hope I ain't shot nobody. That's what I told her when I got to the house, because I ain't ever did nothing to nobody.
Q. Did you mean to shoot him?
A. No I did not. He hit the gun, and it went off. That's what  I didn't shoot him. When he hit that gun, that gun went off.
* * * *
Q. Did you intentionally shoot?
A. No, sir, I did not. It was an accident. He hit the gun, and it went off. I did not intentionally shoot nobody. I never intended to do nothing to anybody.
Gilbert further explained his flight.
I didn't even know he was hit, because, like I said, it happened so fast, when the gun went off, I panicked, you know what I'm saying. I just ran. I ran past my car and turned around, you know, and I went into this gate, this little fence that runs across there, and when I was trying to get over the fence, I thought about it, you know what I'm saying. And like I say, I dropped that gun, right down there, and that's where the gun was.
¶ 30. Gilbert agreed that the only people actually physically present at the time of the shooting were he, Townsend the decedent, his past friend Adams, his friend Fells, and Williams, his friend and the brother of his fiancee. He was surrounded by his friends. No evidence is in the record that Townsend's brothers or family members were anywhere nearby. Gilbert was armed with a 30/30 caliber high powered rifle. He was obviously fully capable of defending himself. Gilbert's explanation that he fled because he "panicked" is feeble indeed.
¶ 31. "[A]n instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge." Holly v. State, 671 So.2d 32, 38 (Miss.1996) (quoting Reynolds v. State, 658 So.2d 852, 856 (Miss.1995) (quoting Fuselier v. State, 468 So.2d 45, 57 (Miss. 1985))). The Mississippi Supreme Court has made it clear that "[w]here the defendant is arguing self-defense, a flight instruction should be automatically ruled out and found to be of no probative value." Banks, 631 So.2d 748, 751.
¶ 32. It is evident that Gilbert focused his defense on the prospect that he accidentally shot Townsend. Gilbert testified that Townsend walked towards him with his hand in his pocket. Gilbert then testified that he walked to his own car and Townsend followed him, cursed him, and kept one hand in his pocket. Gilbert testified that he retrieved a rifle from his trunk and walked away from Townsend. Next, Gilbert testified that Townsend continued to walk towards him and that Townsend had his hand in his pocket. According to Gilbert, he was afraid of Townsend, so he leveled the rifle at Townsend and held it there with one hand. Apparently, they were in close proximity. Gilbert testified that Townsend said, "[y]ou don't have the guts to kill nobody. Man, get that gun out of my face." According to Gilbert's version of events, Townsend hit Gilbert's rifle and Gilbert's rifle swung out and hit Corey Fells in the head. Next, the rifle ricocheted or somehow bounced off Fells's skull, swung back towards Townsend, and accidentally discharged.
¶ 33. It is clear from the record that no evidence or testimony, not even Gilbert's, indicated that Gilbert shot Townsend in self-defense. Rather, Gilbert's own testimony was that Townsend caused the rifle to discharge when he hit it. Gilbert's own testimony demonstrated that he may not have even known if he shot Townsend. In *341 no way did Gilbert testify that he consciously and intentionally shot Townsend in self-defense. If anything, he testified that he pointed the rifle at Townsend in self-defense and that Townsend hit the rifle and caused it to fire accidentally.
¶ 34. Gilbert claims that he ran after shooting Townsend because Gilbert feared retribution if he lingered. There was no testimony that anyone threatened retribution against Gilbert. Even if one could infer that Townsend's friends or family would have wanted to avenge Townsend, there is no evidence that they were at the scene or otherwise made that known at the time Gilbert shot Townsend.
¶ 35. Gilbert submits that he received threats from Townsend's brother after Gilbert was released on bond. Gilbert claims that Banks supports the proposition that, in such a case, "flight seems logical and necessary." Banks, 631 So.2d at 751. It is true that, according to Banks, "[w]here the person against whom self defense has been exercised is still alive and has the back up support of other persons, flight seems logical and necessary." Id. Still, Banks certainly did not hold that flight seems logical and necessary when a defendant kills someone with a rifle and the victim's brother threatens the defendant two weeks afterwards. Gilbert cannot rationally explain his flight on a threat from Townsend's brother that only came two weeks after Gilbert killed Townsend.
¶ 36. In order to avoid a flight instruction under such circumstances, Gilbert should be required to offer some rational and reasonable explanation for his flight. To say that "I panicked" is insufficient. Gilbert's flight did indeed have some probative value; i.e., the jury could have easily concluded that his flight was motivated by a guilty conscience.
¶ 37. Instruction 104.12 of the Mississippi Model Jury Instructions (1999) is the model instruction on flight. It reads:
"Flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, _________, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think it is entitled to in determining the guilt or innocence of the defendant, _______________.
Instruction C-11, the flight instruction given without defense objection, read:
The Court instructs the Jury that flight is a circumstance from which in the absence of a reasonable explanation therefor, guilty knowledge and fear may be inferred. If you find from the evidence in this case, beyond a reasonable doubt, that the defendant, WILLIE J. "BROWNIE" GILBERT, did flee from the scene of the death of ENOCH "CONRAD" TOWNSEND, then the flight of WILLIE J. "BROWNIE" GILBERT is to be considered in connection with all other evidence in this case. You will determine from all of the facts whether the flight was from a conscious sense of guilt or whether it was caused by other things, and give it such weight as you think it is entitled to in determining the guilt or innocence of WILLIE J. "BROWNIE" GILBERT.
C-11 tracks nearly word-for-word with the model jury instruction. Simply said, it was an issue for the jury to consider along with all the other evidence in the case. The jury was able to use its good common sense and honest judgment in evaluating Gilbert's explanation for his flight from the crime scene.
*342 ¶ 38. Additionally, Gilbert testified that he and Townsend had words while Gilbert was at Adams's apartment door. Gilbert said that Townsend went out to the parking lot to meet a mysterious car and returned to confront Gilbert again. According to Gilbert, Townsend had his hands in his pockets. Gilbert testified that Townsend continued to harass him and get in his face. Gilbert said Townsend slapped him on the head. Gilbert explained that he was concerned that Townsend might have had a weapon in his pocket. Thereafter, Gilbert testified that he walked to his car in the parking lot, opened his trunk, retrieved his 30/30 caliber loaded rifle, and attempted to return to Adams's apartment. The confrontation with Townsend escalated. Gilbert then "accidentally" shot Townsend.
¶ 39. Under these facts, there is a serious question regarding Gilbert's right to even claim necessary self-defense. The law in this state has been for years that a defendant who has been in an altercation or dispute with the victim can not temporarily leave the scene of the dispute, arm himself, return to the scene, shoot or kill the victim and thereafter claim necessary self-defense. See Skinner v. State, 751 So.2d 1060(¶ 48) (Miss.Ct.App.1999) ("[O]ne who leaves an altercation, arms himself, and returns with the intent to and does use his weapon on the other party cannot claim self-defense." (quoting Griffin v. State, 495 So.2d 1352, 1354 (Miss.1986))).
¶ 40. Not only is there little to no evidence of self-defense, Gilbert did not object to the instruction at issue. When the State tendered the flight instruction at issue, the trial judge asked Gilbert if he had any objection to the instruction. Gilbert responded, "no objection." That instruction became instruction C-11. When Gilbert filed his motion for new trial, he did not claim that instruction C-11 entitled him to a new trial. He failed to mention C-11 in any way. Gilbert raises this issue for the first time on appeal. At no time has Gilbert raised the propriety of C-11, prior to his appeal to this Court. Gilbert certainly never gave the trial judge an opportunity to pass on the propriety of the flight instruction.
¶ 41. Gilbert claims he was not bound to object to the instruction because it resulted in plain error. Under normal circumstances, "[i]t is the duty of defense counsel to object to an instruction offered by the State which he deems improper, and ordinarily failure to timely object will on appeal be deemed a waiver of any defect." Duvall v. State, 634 So.2d 524, 526 (Miss.1994). "Where, however, the State offers and the circuit judge grants an instruction which we have clearly held is erroneous, we are not going to hold defense counsel to the same degree of diligence he has on instructions this Court has not ruled upon." Id. Gilbert claims he was not bound to object to the flight instruction because Banks held, "[w]here the defendant is arguing self-defense, a flight instruction should be automatically ruled out and found to be of no probative value." 631 So.2d at 751.
¶ 42. This all may very well be, but Gilbert cites no authority that even suggests that a trial judge commits plain error justifying reversal when he gives a flight instruction with no objection from a defendant and where a defendant presents an extremely weak to nonexistent claim of self-defense. We will not initiate that precedent in this case.

VI. DID THE INDICTMENT AGAINST GILBERT ALLEGE THE ESSENTIAL ELEMENTS OF MURDER?
¶ 43. Gilbert argues the initial indictment did not sufficiently allege murder, because it did not allege that he acted out of "deliberate design." He also claims *343 the trial court was in error for allowing a motion to cure this alleged defect at the close of trial. The trial court found the amendment was not one of substance, so it was not prejudicial to Gilbert to so amend.
¶ 44. This Court engages in a relatively broad standard of review in determining whether an indictment is fatally defective. Nguyen v. State, 761 So.2d 873, 874(¶ 13) (Miss.2000). "All indictments may be amended as to form but not as to the substance of the offense charged.... Amendment shall be allowed only if the defendant is afforded a fair opportunity to present a defense and is not unfairly surprised." URCCC 7.09. An indictment may be amended after the State has rested. Montgomery v. State, 891 So.2d 179, 186(¶ 23) (Miss.2004).
¶ 45. Murder is defined as "[t]he killing of a human being without authority of law... [w]hen done with deliberate design to effect the death of the person being killed, or of any human being." Miss.Code Ann. § 97-3-19(1)(a). "Malice aforethought" and "deliberate design" mean the same thing for purposes of defining the offense of murder. Tran, 681 So.2d at 517. Therefore, amending a murder indictment from "malice aforethought" to "deliberate design" is one of form, not substance. Greenlee v. State, 725 So.2d 816, 822(¶ 12) (Miss.1998).
¶ 46. The original indictment charged:
WILLIE J. "BROWNIE" GILBERT in [Lee] County, [Mississippi] on the 18th day of July, A.D., 2003, did wilfully, unlawfully and feloniously and with malice aforethought or deliberate kill and murder Enoch "Conrad" Townsend, a human being; contrary to [§ 97-3-19] in such cases made and provided, and against the peace and dignity of the state of Mississippi.
The case went to trial on this indictment. At the close of evidence, the State moved to amend the indictment, to add the word "design" between the words "deliberate" and "kill." Gilbert objected, but the court allowed the amendment. Since the indictment did already allege "malice aforethought," the judge ruled this amendment was merely one of form, not substance.
¶ 47. Greenlee v. State dealt with an original indictment, worded similarly to the one at bar. In that case, the original indictment read, "Aaron Greenlee did willfully, unlawfully, feloniously, without authority of law and of his malice aforethought, kill and murder one Shelia Greenlee ...." Id. at 821. This indictment was amended to "Aaron Greenlee did willfully, unlawfully, feloniously, without authority of law and by deliberate design to effect the death of the person killed, or of any human being, and the defendant did shoot and kill and murder one Shelia Greenlee, a human being, by shooting her with a rifle ...." Id. The court held the original indictment was sufficient to allege the crime of murder, since "malice aforethought" and "deliberate design" are synonymous. Id. at 822. Further, the court held that changing "malice aforethought" to "deliberate design" was a change of form. Id.
¶ 48. Greenlee is instructive here. Although Gilbert's original indictment only alleged "malice aforethought," it was sufficient to charge the crime of murder by deliberate design under Mississippi Code Annotated section 97-3-19(1)(a). The amendment was proper as one of form, and since the two terms are synonymous, Gilbert was not prejudiced by the addition of "deliberate design" to the indictment. This issue has no merit.

VII. DID THE TRIAL COURT ERR WHEN IT OVERRULED GILBERT'S REQUEST FOR A CONTINUANCE?
¶ 49. The day before trial, counsel for Gilbert made an ore tenus motion *344 for continuance. Gilbert's attorney claimed that he needed a continuance to procure a toxicology report and to locate three witnesses. Neither the State nor Gilbert subpoenaed those three witnesses. Gilbert's attorney admitted that he received discovery, including the names of those missing witnesses, two months before trial. Accordingly, the trial judge denied Gilbert's request for a continuance.
¶ 50. "The decision to grant or deny a continuance is left to the sound discretion of the trial court." Stack v. State, 860 So.2d 687(¶ 7) (Miss.2003). "Unless manifest injustice appears to have resulted from the denial of the continuance, this Court should not reverse." Lambert v. State, 654 So.2d 17, 22 (Miss. 1995). "The burden of showing manifest injustice is not satisfied by conclusory arguments alone, rather the defendant is required to show concrete facts that demonstrate the particular prejudice to the defense." Stack, 860 So.2d at (¶ 7) (internal quotations omitted).
¶ 51. We find that Gilbert suffered no manifest injustice as a result of the trial judge's decision. Dr. Hayne testified that Townsend had a blood-alcohol content of.03 at the time Gilbert shot and killed him. Dr. Hayne also testified that Townsend had inhaled some marijuana shortly before Gilbert shot him. Gilbert suffered no prejudice as a result. As for the missing witnesses, Gilbert had months prior to trial to locate those witnesses, interview them, and subpoena them for trial. Gilbert does not indicate to what those witnesses would have testified or how their testimony would have benefitted his defense. Furthermore, Gilbert made no effort whatsoever to comply with the requirements of Section 99-15-29 of the Mississippi Code Annotated (Rev.2000). That Section states that:
On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or the presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought to delay only, but that justice may be done.
Accordingly, this issue has no merit.

VII. DID THE CUMULATIVE EFFECT OF ERRORS INFRINGE UPON GILBERT'S RIGHT TO A FAIR TRIAL?
¶ 52. Gilbert claims that the cumulative errors in this case demand that we reverse for a new trial. As we find no cumulative error, there can be no cumulative effect. This issue is meritless.
¶ 53. THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE TO LIFE IN PRISON IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.